## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | Case No. 15-01627(MCF) |
| SAN JUAN RESORT OWNER, INC. | Chapter 11 |
| _____Debtor._____ | |

### MOTION FOR ENTRY OF THE SALE ORDER: (A) APPROVING THE ASSET PURCHASE AGREEMENT AND SALE OF THE SALE ASSETS, FREE AND CLEAR, TO THE STALKING HORSE PURCHASER OR TO THE SUCCESSFUL BIDDER, (B) APPROVING THE BIDDING PROCEDURES TO SOLICIT HIGHER AND BETTER OFFERS AND SELECT THE SUCCESSFUL BIDDER, AND (C) APPROVING THE SETTLEMENT AGREEMENT WITH BANCO POPULAR

**TO THE HONORABLE UNITED STATES**
**BANKRUPTCY COURT:**

**COME NOW** San Juan Resort Owner, Inc. (the "Debtor") and secured creditor Banco Popular de Puerto Rico ("BPPR") (jointly, the "Parties"), each by their respective undersigned counsel, and respectfully submit this Motion for Entry of the Sale Order: (A) Approving the Asset Purchase Agreement and Sale of the Sale Assets, Free and Clear, to the Stalking Horse Purchaser or to the Successful Bidder, (B) Approving the Bidding Procedures to Solicit Higher and Better Offers and Select the Successful Bidder, and (C) Approving the Settlement Agreement with BPPR (the "Sale Motion").

### Preliminary Statement

Debtor is the owner of a 96-room boutique-style beachfront hotel, located in the Condado sector of San Juan, Puerto Rico, known as San Juan Beach Hotel (the "Hotel"). Prior to commencing this bankruptcy case, the Debtor, as detailed below, received proposals from various interested parties to purchase the Hotel. To maximize the potential value of the estate, the Debtor engaged in substantial negotiations with its secured creditor, BPPR, and with parties interested in purchasing the Debtor's assets, in order to attempt to present (subject to Court

approval as provided herein) a consensual bankruptcy proceeding that allows the Debtor to maximize recoveries, minimize or eliminate potential disputes with its secured creditor, and to provide for an orderly sale process which is open to all interested bidders. As part of those negotiations and to ensure the viability of this bankruptcy case, the Debtor also solicited pre-petition proposals from all interested parties to participate as a proposed stalking horse purchaser.  The result of those negotiations, as well as those conducted after the filing of this case, are included as part of this Sale Motion for approval by this Court.

Accordingly, through this Sale Motion, the Parties request that the Court enter an order approving the stalking horse proposal made by SJ Beach PR LLC an affiliate of Paulson PRV Acquisitions, LLC and the sale to such purchaser, the bidding procedures pursuant to which the Debtor will market the assets available for sale and solicit higher and better offers to that presented by the stalking horse purchaser, and the settlement agreement entered into between BPPR and the Debtor.  The sale includes the sale of the Hotel and the personal property located within the Hotel owned by Debtor (the "Sale Assets") free and clear of all liens, claims and encumbrances as set forth herein.

Further, to facilitate the sale of the Hotel, that certain personal property located in the Hotel which is owned by Premier Hotel Management, Inc. ("PHM"), an affiliate of the Debtor, that are used and necessary for the operation of the Hotel (the "PHM Assets") is also being sold as part of the proposed sale.  While PHM is not a debtor in possession and the PHM Assets are not part of this case nor subject to the Bidding Procedures, since the PHM Assets are used or necessary for the operation of the Hotel, the Debtor has obtained the agreement from PHM to sell the PHM Assets to the stalking horse purchaser or to any successful bidder as detailed below.

00236509; 1

The Parties understand that the sale process included herein, which includes an open process where any party that is interested can present an alternative transaction, subject to the bidding procedures, which is higher and better than that presented by the stalking horse purchaser, is in the best interest of the estate, as it provides for an orderly sale process to maximize the value of the Debtor's assets. Further, the settlement agreement entered into with BPPR paves the way for the sale process and the consensual resolution of this bankruptcy case, as through the carve-out negotiated with BPPR, the Debtor's estate will receive proceeds from the sale which would otherwise had gone to BPPR on account of its secured claim, to satisfy its obligations under a plan of liquidation and provide a distribution to creditors of the estate. As detailed below, the settlement agreement is critical as BPPR's pre-petition claims against the Debtor exceed $17 Million and the total proposed purchase price for the Sale Assets and the PHM Assets is approximately $9.450 Million.

For these reasons, and those set forth below, the Parties request that the Court approve the Sale Motion, the Settlement Agreement (defined below) with BPPR, the Asset Purchase Agreement (defined below) with the stalking horse purchaser, the PRTC Agreement (defined below), and the Bidding Procedures (defined below) detailed and included with the Sale Motion (the Settlement Agreement, Asset Purchase Agreement, PRTC Agreement, and Bidding Procedures, collectively, the "Sale Documents").

## **Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Puerto Rico Local Bankruptcy Rules 6004-1 and 9013-1.

### Background

A.    The Bankruptcy Filing

1.    On March 5, 2015 (the "Petition Date"), the Debtor filed a voluntary petition under the provisions of chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Puerto Rico (the "Bankruptcy Court"), Case No. 15-1627(MCF).

B.    The Pre-Petition Loan Documents

2.    Prior to the Petition Date, the Debtor entered into various credit facilities with BPPR detailed in the verified complaint attached as **Exhibit 1** (the "Credit Facilities").

3.    As of the Petition Date, the Debtor owes to BPPR approximately $17,898,437.58 under the Credit Facilities for principal, interest, fees, charges and other amounts (collectively, the "BPPR Pre-Petition Claim") as set forth below:

| Loan Number | Principal | Interest | Other Charges* | TOTAL |
|---|---|---|---|---|
| 2754568-9002 | $11,517,123.46 | $3,939,695.07 | $184,919.06 | $15,641,737.59 |
| 2754568-2001 | $1,800,000.00 | $456,699.99 | $0.00 | $2,256,699.99 |
| ---------------- | **$13,317,123.46** | **$4,396,395.06** | **$184,919,06** | **$17,898,437.58** |

*Insurance and property taxes

4.    To secure the obligations under the Credit Facilities and the amounts due under the BPPR Pre-Petition Claim, the Debtor, among others, executed the mortgages and security agreements detailed in the verified complaint attached as **Exhibit 1** (collectively with the Credit Facilities, the "Loan Documents") and granted first priority perfected security interests to BPPR over substantially all of the Debtor's assets, including the Sale Assets (collectively, the

"Collateral").   Attached as **Exhibit 2** is a title study showing the legal description for the real estate (the Hotel) and the mortgage notes that BPPR holds over the same.

5.      Prior to the Petition Date, the Debtor defaulted under the terms of the Loan Documents and BPPR commenced foreclosure and collection proceedings.  See **Exhibit 1**.

C.  The Pre-Petition Proposals to Acquire the Hotel

6.      Prior to commencing this case, the Debtor received a number of proposals from interested parties to purchase the Hotel.

7.      Specifically, on or about August 21, 2014, the Debtor executed an option agreement (the "Option Agreement") with Condado San Juan Hotel 2, LLC ("Condado San Juan") to sell the Hotel for an approximate amount of $8,250,000 with a net payment to BPPR of approximately $7,500,000.

8.      The Option Agreement was specifically conditioned, as a requisite for the agreement becoming effective, upon BPPR approving the discounted payoff transaction detailed in such agreement.

9.      On or about November 12, 2014, BPPR formally notified the Debtor that it did not approve the discounted payoff transaction detailed in the Option Agreement.  The Debtor promptly advised Condado San Juan of such determination.  Accordingly, the Option Agreement never became effective, as the transaction detailed therein was not approved by BPPR. Nonetheless, in the event that the Option Agreement is somehow effective, which the Debtor understands would be contrary to the terms of the Option Agreement, the Debtor filed on March 11, 2015 a motion to reject the Option Agreement.

00236509; 1

10.     During August 2014, the Debtor also received proposals to acquire the Hotel from Paulson PRV Acquisition Corp. and from SRE Acquisitions II, LLC ("SRE").  The Debtor did not accept Paulson PRV Acquisition Corp. or SRE's proposals at that time.

11.     Commencing in December 2014, the Debtor engaged in substantial negotiations with its secured creditor, BPPR, to attempt to structure a consensual sale process that would maximize recoveries for the estate, resolve the pending litigation with BPPR, reach an agreement with BPPR on a carve-out and minimum distribution to BPPR from any sale, and provide an opportunity for all interested parties to participate in the sale in an open and transparent process.

12.     Accordingly, the Debtor proposed to commence a bankruptcy case, after reaching an agreement on the sale process and minimum distribution with BPPR, to provide for a sale process as detailed herein where all interested parties could submit their proposal to acquire the Hotel, and the value of the estate's assets would be maximized.

D.     The Settlement Agreement with BPPR.

13.     The Debtor's negotiations with BPPR culminated with the execution, on March 5, 2015 (prior to the Petition Date) of a Settlement Agreement (the "Settlement Agreement") between BPPR and the Debtor, among other borrowers.  The Settlement Agreement is included as **Exhibit 3** and incorporated as if set forth in full herein. In summary, the Settlement Agreement includes[1]:

- Consent to Sale, Settlement Payment, and Bidding Procedures.  As part of the Settlement Agreement, BPPR provided its consent to sale process and bidding

---

[1]     The following is provided as a summary only of the terms of the Settlement Agreement.  The Settlement Agreement controls the terms agreed to between the Debtor and BPPR and in the event of any inconsistency between the summary or Sale Motion and the Settlement Agreement, the Settlement Agreement controls.

00236509; 1

6

procedures detailed herein and to accept the Settlement Payment[2] in exchange for, among other things, releasing all of its liens over the Sale Assets.

- <u>Consent to Carve-Out</u>.  As part of the Settlement Agreement, BPPR agreed to the substantial carve-out from the sale proceeds that would otherwise had been paid to BPPR.  Specifically, as part of the Settlement Agreement, BPPR has consented to the Carve-Out[3] from the Purchase Price[4] in an amount that shall not exceed $1,181,627.00 to pay from such Carve-Out solely as administrative and certain priority tax and other claims, the amounts necessary to settle the existing claims and expenses set forth in **<u>Exhibit 4</u>**.

- <u>Increases to Settlement Payment to BPPR</u>.  As part of the Settlement Agreement, the Debtor agreed that the Settlement Payment to BPPR shall be increased by an amount equal to 100% of any funds received as part of the Sale and/or any loan obtained in order to effect the Settlement Payment, in excess of the amounts necessary to cover (i) the initial Settlement Payment; and (ii) the amounts necessary to settle any of the existing debts set forth in **<u>Exhibit 4</u>** or Schedule II of the Settlement Agreement.  In other words, the Settlement Payment to BPPR shall be increased by 100% of: (a) any reduction in the amounts needed to satisfy the claims set forth in **<u>Exhibit 4</u>** or Schedule II to the Settlement Agreement from the amounts already budgeted in such schedule; as well as (b) any increases to the sale price as a result of receiving a higher and better offer through the bidding procedures.  The Debtor also agreed that in no event shall the amount of the

---

[2]   As that term is defined in the Settlement Agreement.
[3]   As that term is defined in the Settlement Agreement.
[4]   As that term is defined in the Settlement Agreement.

Carve-Out from the Purchase Price exceed $1,181,627.00, which may be reduced as contemplated herein and in the Settlement Agreement.

- <u>Other Terms</u>.  While not relevant to this proceeding as it involves assets and credit facilities that are not part of the estate, BPPR and the Debtor submit, in the interest of full disclosure of the terms of the Settlement Agreement, that on the Closing Date[5] and subject to the terms and conditions of the Settlement Agreement, the other borrowers and signatories under the Settlement Agreement (e.g., not the Debtor or any debtor-in-possession) would be released from their separate credit facilities that do not form part of this estate.

14.     The Debtor understands that through the Settlement Agreement that it negotiated and entered into, as well as the agreement on the Carve-Out, upon closing of the Sale and receipt of the Carve-Out, the Debtor would generate sufficient proceeds to fund and provide the required distributions under the Plan.  The Debtor also understands that without the Settlement Agreement that it negotiated, the full amount of the sale price would have been paid to BPPR, considering the amount of the BPPR Pre-Petition Claim (over $17 Million) and the proposed total purchase price for the Sale Assets and PHM Assets (approximately $9.450 Million) and BPPR would have foreclosed over its Collateral, including the Hotel, all of its accounts receivable and any other personal property of the Debtor which form part of the BPPR Collateral.

E.     <u>Pre-Petition Proposals for Stalking Horse Purchaser</u>

15.     To ensure the viability of this bankruptcy case and that the Debtor could comply with the minimum Settlement Payment agreed to under the Settlement Agreement and thus receive the benefits of the Carve-Out, prior to commencing the case, on February 17, 2015, the

---

[5]      As that term is defined in the Settlement Agreement.

Debtor circulated, by electronic and certified mail, a proposed bid and sale procedure to all parties that had shown an interest in acquiring the Hotel.  A copy of the proposed bid procedures, that were circulated is included as **Exhibit 5**.

16.     As part of the proposed sale procedures, the Debtor requested all interested bidders to submit their proposals to participate as a potential "stalking horse purchaser" for the sale of the Hotel through this bankruptcy case.

17.     As a result of such efforts, the Debtor received two proposals to participate as a "stalking horse purchaser" under the proposed bidding procedures.  After analyzing such proposals and discussing them with BPPR, the Debtor selected SJ Beach PR LLC ("Paulson") as having made the highest and best offer for the Sale Assets and to participate as a stalking horse purchaser through the proposed bidding procedures.

F.      The Stalking Horse Asset Purchase Agreement

18.     Since the Petition Date, and after receiving the proposal detailed above, the Debtor has engaged in substantial negotiations with Paulson to attempt to reach an agreement on the sale of the Sale Assets as a stalking horse through the bidding procedures set forth herein.

19.     Accordingly, on March 27, 2015, Paulson and the Debtor agreed on terms of the asset purchase agreement set forth as **Exhibit 6**, which sets forth the terms upon which Paulson will acquire and the Debtor will sell, subject to Court approval and the bidding procedures set forth herein, including, the receipt of higher and better offers, the Sale Assets.

20.     The terms of the proposed sale to Paulson (the "Stalking Horse Proposal") are detailed in the Asset Purchase Agreement (the "APA") set forth on **Exhibit 6**.

21.     The Sale to the Stalking Horse Purchaser, or to any Successful Bidder, involves the sale of the Sale Assets and that certain personal property located in the Hotel which is owned

by PHM, an affiliate of the Debtor, that are used and necessary for the operation of the Hotel and listed in Schedule F to the APA (the PHM Assets).  PHM is not a debtor in possession, the PHM Assets are not part of this estate, and the sale of the PHM Assets is not subject to Court approval. However, since the PHM Assets are used or necessary for the operation of the Hotel, PHM has agreed to sell the PHM Assets to the Stalking Horse Purchaser, through a separate asset purchase agreement, or to the Successful Bidder for the amount of $410,443.00 (the "PHM Purchase Price").  The PHM Assets and PHM Purchase Price are not subject to the Bidding Procedures. In other words, PHM shall sell the PHM Assets to the Stalking Horse Purchaser or to any Successful Bidder for the same amount as the PHM Purchase Price.

22.     The terms of the APA are incorporated as if set forth in full herein.  In summary, the Stalking Horse Proposal and APA includes[6]:

- Purchase Price:  $9,450,000, consisting of (a) a cash payment of $8,689,557.00 on the closing date, (b) savings of approximately $350,000, as detailed below, from the amounts budgeted in the initial carve-out for the Puerto Rico Tourism Company (the "PRTC"), and (c) the PHM Purchase Price for the PHM Assets ($410,443).

- PRTC: Paulson has reached a preliminary agreement with the PRTC, subject to confirmation by the PRTC, upon issuance of the Sale Order requested herein, for PRTC to accept a discounted payment from Debtor, on the Closing Date, of the amount initially budgeted by the Debtor for the PRTC as part of the initial Carve-

---

[6]     The following is provided as a summary only of the terms of the APA.  The APA controls the terms agreed to between the Debtor and Paulson and in the event of any inconsistency between the summary or Sale Motion and the APA, the APA controls the agreement between the Debtor and Paulson.

Out, provided that Paulson is the Stalking Horse Purchaser.[7]   Specifically, as set forth in the letter included as **Exhibit 7** to the Sale Motion (the "PRTC Agreement"), the PRTC has agreed to accept, on the Closing Date, the amount of $616,326 in full accord and satisfaction of all amounts owed to the PRTC as of the Petition Date which amounts total approximately $1,058,983 as per the terms of a settlement agreement between PRTC and Debtor, to be executed at closing (the "PRTC Settlement").

- Settlement Payment to BPPR.  A net and minimum Settlement Payment to BPPR in the amount of $7,857,930.00.

- Carve-Out.  Based on the savings detailed above on the claim by PRTC through the PRTC Agreement, a Carve-Out agreed to by BPPR in the amount of $831,627.

- Deposit: A cash deposit in the amount of $1,000,000.00 subject to the terms and conditions set forth in the APA.

- Inspection Period:  An inspection period that expires on the 30th day from the date that this Sale Motion is filed, as set forth in the APA.

- Bid Protections:  A break-up fee of 3% of the purchase price and certain expense reimbursements up to a maximum amount of $25,000, as set forth in the APA, in the event that a higher and better offer for the Sale Assets is received and accepted and the Sale Assets sold to such bidder.

---

[7]      Accordingly, this discount reduces the amount of the Carve-Out required to satisfy the budgeted claim of the PRTC and the $350,000 in savings provides a higher Settlement Payment to BPPR.

- <u>Closing Date:</u> Within the time frame set forth in the Bidding Procedures, subject to the prior satisfaction of the conditions to close detailed in the APA.

G.     <u>The Bidding Procedures:</u>

23.     The sale to the Stalking Horse Purchaser is proposed under the Bidding Procedures set forth and included as **<u>Exhibit 8</u>** herein. The Bidding Procedures are incorporated as if set forth in full herein. In summary, the Bidding Procedures include the terms and conditions detailed below[8].

24.     The Sale is subject to competitive bidding and an auction process, and higher or otherwise better offers being made with respect to the Sale Assets.

25.     The Bidding Procedures provide the terms to consider and submit proposals to acquire the Sale Assets, the requisites for any such proposals, the deadline to submit them, the time-frame for parties to conduct due diligence, the proposed auction date, as well as the selection of the Successful Bidder (as that term is defined in the Bidding Procedures).

H.     <u>Sale Hearing</u>

26.     As part of the approval of the Bidding Procedures, the Debtor and BPPR are requesting that a hearing to consider the approval of the Sale Motion, the Sale, Settlement Agreement, PRTC Settlement, APA, and the Bidding Procedures is held (the "Sale Hearing") and concluded within the next thirty (30) days. The Debtor and BPPR affirm that a prompt determination is needed given the closing deadlines and conditions included in the APA and the Stalking Horse Proposal and to ensure that the Parties can comply with the terms set forth therein. Further, the Parties would like to provide certainty to potential bidders of the Bidding

---

[8]     The following is provided as a summary only of the terms of the Bidding Procedures. The Bidding Procedures control the terms of the Sale and in the event of any inconsistency between the summary or Sale Motion

00236509; 1

Process that is approved by the Court, which would require a prompt determination given the number of parties that have expressed interest in the Sale.     Accordingly, the Parties request from this Court that the Sale Order be approved and entered as soon after the conclusion of the Sale Hearing as practicable and no later than the deadlines provided in the Bidding Procedures and APA.

H.      <u>Sale Order</u>

27.     As part of the Sale, a condition to the effectiveness of the APA, the Stalking Horse Proposal, and to the obligations of BPPR and the Debtor therein, is the entry of the Sale Order by the Bankruptcy Court, similar in form to the proposed Sale Order under **<u>Exhibit 9</u>**, approving, without limitation, this Sale Motion, the Bidding Procedures, the Settlement Agreement, the APA, the PRTC Agreement and the exectution of the PRTC Settlement, and including the findings and determinations relating to the Sale Documents included in the proposed Sale Order.

<u>**Supporting Authority**</u>

**A.  Sale of the Assets Free and Clear of all Liens, Claims, Encumbrances and Interests**

Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use or sell assets of the estate, other than in the ordinary course of business, free and clear of liens, claims and encumbrances. See 11 U.S.C. § 363(b)(1); see also Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test, *i.e.*, whether a sale is supported by a sound business reason and is based on a sound exercise of

---

and the Bidding Procedures, the Bidding Procedures (as may be modified by the Court) control the sale process.

business judgment. 3-363 Collier on Bankruptcy P 363.02. "The court should not substitute its judgment for the trustee's but should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms. <u>Id</u>.

The "sound business purpose test" consists, mainly, of four factors to consider when determining whether a pre-confirmation sale of a chapter 11 debtor's assets is appropriate: (i) a sound business reason or emergency justifying the sale; (ii) good faith; (iii) adequate and reasonable notice; and (iv) that the price to be paid is fair and reasonable. Courts have consistently held that approval of a proposed sale of property pursuant to Section 363(b) is appropriate if the record reveals a "good business reason" for approval of the proposed sale. <u>See</u>, <u>In re Eldercare</u>, 390 B.R. 762, 770 (Bankr. D. Conn. 2008); <u>In re Phoenix Steel Corp.</u>, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a Section 363 sale are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith.") The Court may find that a sound business purpose for the sale of assets property of debtor outside the ordinary course of business exists when such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. <u>Comm. of Equity Security Holders v. The Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063 (2nd Cir. 1983).

The Parties submit that the sale of the Hotel to Paulson or the Successful Bidder satisfies the "sound business reason test" and is a proper exercise of the Debtor's business judgment. The transfer of the Hotel is supported by the following sound business reasons: (a) there is a risk of deterioration of the value of the Hotel if the sale is not consummated; (b) the Sale will present the best opportunity to maximize the value of the estate on an ongoing concern basis and avoid decline and devaluation of the Hotel that could arise in the absence of approval of the Sale

Documents and continued litigation with BPPR; (c) unless the sale, Settlement Agreement and Carve-Out are approved, creditors' recoveries will be zero given the amount of the BPPR Pre-Petition Claim; (d) the Debtor is satisfying an obligation of over $17,000,000.00 through the Sale, Settlement Agreement, and Settlement Payment and providing a distribution to the estate; and (e) part of the Carve-Out proceeds will be distributed to unsecured creditors who would otherwise receive nothing from any disposition of the Hotel. Further, the Sale is proposed as an open bidding, where any interested bidder that qualifies under the Bid Procedures may present its proposal to acquire the Sale Assets. See, In re Wiedbolt Stores, Inc., 92 B.R. 309, 312 (N.D. Ill. 1988) (concluding that the Bankruptcy Court authorized a transfer in lieu of foreclosure as a sale under section 363 as the transfer in exchange for the release of a $64,000,000.00 was a transfer of assets for value. Furthermore, the Court noted that Bankruptcy Rule 6004 expressly provides for private sales.). See also Palmas Country Club Inc., Case No. 10-07072 (ESL) (approving private sale and transfer to pursuant to section 363 of the Bankruptcy Code lender in exchange for satisfaction of lender's claims).

Further, the main alternative to the sale is the continuation of the state court action and foreclosure proceedings by BPPR. The Parties believe that a foreclosure sale will yield no proceeds for the Debtor's estate. Furthermore, the Carve-Out established in the Settlement Agreement and Sale Motion will not be available in a foreclosure.

Accordingly, the Debtor submits that approval of the Sale Documents is supported under the case law set forth above.

### B. Break-up Fee and Expense Reimbursement

"A breakup fee is a fee payable to a potential buyer if the transaction fails for any reason not within the buyer's control… [e]xpense reimbursement requires the estate to reimburse the

potential buyer's due diligence and contract negotiation expenses, including professional fees, if the buyer's transaction is not approved." 3-363 Collier on Bankruptcy P 363.02. Courts have adopted as a rule of thumb a limitation on a breakup of about 3 percent of the consideration the buyer will pay for the assets.

Approval of break-up fees and expense reimbursements in connection with the sale of a debtor's property pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. See In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001); Gey Assocs. v. 310 Assocs. (In re 310 Assocs.), 346 F.3d 31, 33-34 (2d Cir. 2003); 3 Collier on Bankruptcy P 363.03[7] (15th rev. ed. 2002) ("It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated."). The basis for approving a break-up fee and expense reimbursement is the advantage provided by the stalking horse bid to both the buyers and sellers in that it (a) encourages additional, competitive bidding, (b) supports the sellers' attempts to receive the highest or otherwise best offer and (c) compensates the buyer for the risk of being outbid. See In re Ryan, 261 B.R. at 870.

Many bankruptcy courts approve break-up fees under the "business judgment rule standard." Under that standard, courts grant deference to the actions of the Debtor taken in good faith and in the exercise of honest business judgment. Specifically, courts have approved break-up fees so long as (a) the relationship between the parties is not tainted by self-dealing, (b) the fee does not hamper bidding and (c) the amount of the fee is reasonable in relation to the size of the transaction. Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992),appeal dismissed,3 F.3d 49 (2d Cir. 1993).

The break-up fee here should be approved under the "business judgment rule" standard. First, the parties negotiated the APA and Bid Procedures, including the break-up fee at arm's length. Second, the break-up fee should not hamper bidding, given that the amount of the fee is reasonable in light of the size of the transaction and is similar in size to other break-up fees that have been approved.

The Parties understand that Paulson would not enter into the APA without the Break-Up Fee and Expense Reimbursement (as defined in the APA).  The Parties understand that the APA is critical to the Sale and Bidding Procedures, as it sets a floor to market and sell the Sale Assets, and provides potential qualified bidders a basis upon which to evaluate (or re-evaluate) the proposed transaction and submit a higher and better alternative transaction. Such renewed interest will likely assist the Debtor in conducting a competitive auction, the outcome of which will be the highest or otherwise best offer for the Hotel. Further, payment of the Break-up Fee and Expense Reimbursement would be funded from the additional bid increment provided under any higher or better offer to the Stalking Horse Proposal by any other Successful Bidder.

Accordingly, the Parties request that the Court approve the APA with the bid protections included therein.

### C.  The Successful Bidder Should be Afforded all Protections under Section 363(m)

Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) of the Bankruptcy Code may be later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

Essentially, section 363(m) affords "finality to judgments approving sales in bankruptcy by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids. . . . The finality and reliability of the judicial sales enhance the value of the assets sold in bankruptcy." In re Stadium Management Corp., 895 F.2d 845, 847 (1st Cir. 1990) citing Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.), 98 Bankr. 609, 617 (Bankr.D.Mass. 1989) (citations omitted); In re Onouli-Kona Land Co., 846 F.2d 1170, 1172-73 (9th Cir. 1988); In re Sax, 796 F.2d 994, 998 (7th Cir. 1986).

The effect of § 363(m) is that "when an order confirming a sale to a good faith purchaser is entered and a stay of that sale is not obtained, the sale becomes final and cannot be reversed on appeal." In re Stadium Management Corp., 895 F.2d at 847 quoting Creditor Committee v. Armstrong Business Credit Corp. (In re Saco Local Development Corp.), 19 Bankr. 119, 121 (BAP 1st Cir. 1982). Absent a stay, the court must dismiss a pending appeal as moot. In re Stadium Management Corp., 895 F.2d at 847 citing In re the Charter Co., 829 F.2d 1054 (11th Cir. 1987) (per curiam), cert. denied, 485 U.S. 1014, 108 S. Ct. 1488, 99 L. Ed. 2d 715 (1988); Miami Center Partnership v. Bank of New York, 820 F.2d 376, corrected in part and rehearing denied, 826 F.2d 1010 (11th Cir. 1987), vacating [826 F.2d 1010], reaffirming [820 F.2d 376] and rehearing denied, 838 F.2d 1547 (11th Cir. 1988), cert. denied, 488 U.S. 823, 109 S. Ct. 69, 102 L. Ed. 2d 46 (1988); In re Sax, 796 F.2d 994 (7th Cir. 1986); International Union, U.A.W. v. Morse Tool, Inc. (In re MTI Holding Corp.), 85 Bankr. 666, 668 (D.Mass. 1988).

Although the Bankruptcy Code does not define "good faith purchaser", courts have adopted the traditional equitable definition of one who purchases the assets for value, in good faith, and without notice of adverse claims. To constitute lack of good faith, a party's conduct in

connection with the sale must usually amount to fraud or collusion between the purchaser and

other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.  The

Parties submit that Paulson is a "good faith purchaser" as defined above, and given the open and

transparent sale process under the Bidding Procedures, any Successful Bidder should also be

deemed a good faith purchaser as defined above.

### D.  Free and Clear Sale

Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under

section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of

the following conditions is satisfied: (a) applicable non-bankruptcy law permits the sale of the

property free and clear of such interest; (b) the entity holding the lien, claim or encumbrance

consents to the sale; (c) where the interest is a lien, the price at which such property is to be sold

is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide

dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a

monetary satisfaction of its interest. 11 U.S.C. § 363(f).

The Parties will be able to satisfy the requirements under section 363(f) of the

Bankruptcy Code, insofar as pursuant to the Bidding Procedures any entity holding liens, claims,

encumbrances and other interests on the Sale Assets will receive notice of the Sale Motion and

the Sale Hearing. Accordingly, all parties in interest will be given sufficient opportunity to object

to the relief requested herein. To the extent, however, that any such entity does not object to the

Sale, that entity should be deemed to have consented to the relief sought herein. See

Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the

Bankruptcy Code limits the conditions under which an interest can be extinguished by a

bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of

objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted). Thus, to the extent that no party holding a lien objects to the relief requested in the Sale Order, the sale of the Assets free and clear of all Liens, except those liabilities expressly assumed by the purchaser, satisfies section 363(f)(2) of the Bankruptcy Code.

In addition, the Parties submits that the Sale Assets may be sold free and clear of all successor liability claims. Notwithstanding reference to the free and clear conveyance of "any interest" under section 363(f) of the Bankruptcy Code, that section has also been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims. Accordingly, the Parties requests that the Hotel be transferred to the Purchaser free and clear of all liens, claims and encumbrances, including without limitation those listed in Exhibit B of the Sale Order and all successor liability claims, and that the sale and transfer be exempt of payment of any and all required stamps and vouchers and other costs and expenses.

## **NOTICES**

The Parties have provided notice of this Sale Motion, by certified mail, to (collectively, the "Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the Stalking Horse Purchaser; (iii) all parties who received a copy of the pre-petition proposed procedures detailed above; (iv) all persons or entities that have requested notice of the proceedings in this chapter 11 case; (v) all parties who are known to claim liens or other interests upon the Sale Assets; (vi) all applicable federal, state and local taxing and regulatory authorities, including, but not limited to, the Puerto Rico Tourism Company; (vii) to the top twenty (20) unsecured creditors (as per the Debtor's schedules); (ix) any and all parties in interest.

00236509; 1

In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary.

WHEREFORE, the Parties respectfully request that the Court, on or before April 27, 2015:

(a) schedule the Sale Hearing on or before 30 days from the date of this Sale Motion;

(b) enter the Sale Order, similar to the proposed Sale Order under **Exhibit 9,** waiving any applicable stay period under Fed. R. Bankr. Proc. 6004(h);

(c) enter the Sale Order approving the APA (**Exhibit 6**) and the PRTC Settlement (**Exhibit 7**);

(d) enter the Sale Order approving the Settlement Agreement (**Exhibit 3**);

(e) enter the Sale Order approving the Bidding Procedures (**Exhibit 8**) to consider higher and better offers and the procedure for selecting the person or entity that submits the highest or otherwise best offer (the "Successful Bidder");

(f) enter the Sale Order approving the Sale to the Successful Bidder; and

(g) granting such other relief as is just and proper.

**RESPECTFULLY SUBMITTED.**

NOTICE

Within twenty-one (21) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if you were served by mail, any party against whom this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the clerk's office of the United States Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by law; (ii) the requested relief is against public policy; or (iii) in the opinion of the court, the interest of justice requires otherwise.

**WE HEREBY CERTIFY** that on this same date, the Parties have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case, including, but not limited to, Debtor's

00236509; 1

counsel and the U.S. Trustee. Furthermore, the Parties have provided notice of this Sale Motion, by certified mail, to the Notice Parties.

In San Juan, Puerto Rico, this  27th day of March, 2015.

**WILLIAM M. VIDAL CARVAJAL, PSC**
Attorney for Debtor
MCS Plaza
Suite 801
255 Ave. Ponce de Leon Ave.
Hato Rey, Puerto Rico 00918
Tel. 787 764-6867
Fax  787 764-6491


*s/William M. Vidal Carvajal*
William M. Vidal-Carvajal
USDC No. 124803
William.m.vidal@gmail.com

**O'NEILL & BORGES LLC**
*Attorneys for Banco Popular de Puerto Rico*
American International Plaza
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Tel.: (787) 764-8181
Fax: (787) 753-8944


*s/ Luis C. Marini*
Luis C. Marini
USDC No. 222301
luis.marini@oneillborges.com

*s/Myrna L. Ruiz-Olmo*
Myrna L. Ruiz-Olmo
USDC-PR No. 223209
myrna.ruiz@oneillborges.com

00236509; 1