## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | |
| | CASE NO.  15-01627 (MCF) |
| SAN JUAN RESORT OWNERS, INC. | |
| Debtor | CHAPTER 11 |

# DISCLOSURE STATEMENT

## OF

# SAN JUAN RESORT OWNERS, INC.

**WILLIAM M. VIDAL-CARVAJAL, ESQ.**
**USDC PR- 124803**
Counsel for Debtor
MCS Plaza, Ponce de León Ave.
Suite 801
San Juan, PR 00917
Tel.: 787-764-6867
Fax: 787-764-6496

00241300; 1

**San Juan Resort Owners, Inc.**                                    Case No. 15-01627 (MCF)
*Disclosure Statement*                                                          Page 2

## INDEX

| | | |
|---|---|---|
| I. | **INTRODUCTION** | 4 |
| II. | **SUMMARY OF THE PLAN** | 5 |
| III. | **INFORMATION ABOUT THE REORGANIZATION PROCESS** | 8 |
| | 3.1 *Purpose of a Disclosure Statement* | 8 |
| | 3.2 *Voting Procedure* | 8 |
| | 3.3 *Ballots* | 9 |
| | 3.4 *The Confirmation Hearing* | 9 |
| | 3.5 *Acceptances Necessary to Confirm the Plan* | 10 |
| IV. | **GENERAL INFORMATION** | 11 |
| | 4.1 *Description and Historical View of the Debtor* | 11 |
| | 4.2 *Events Preceding Debtor's Chapter 11 Filing* | 11 |
| | 4.3 *Debtor's Post-Petition Endeavors.* | 12 |
| V. | **CLAIMS AGAINST DEBTOR** | 12 |
| | 5.1 *Claims Against Debtor* | 13 |
| | 5.2 *Objections to Claims* | 13 |
| VI. | **DESCRIPTION OF THE PLAN** | 13 |
| | 6.1 *Unclassified Claims* | 14 |
| | 6.2 *Professional Fee Claims* | 15 |
| | 6.3 *Priority Tax Claims and Other Priority Claims* | 15 |
| | 6.4 *Classes of Claims and Equity Interests* | 16 |
| | 6.5 *Treatment of Claims.* | 16 |
| | 6.6 *Means for Implementation of the Plan.* | 18 |
| | 6.7 *Debtor's Post Confirmation Management.* | 18 |
| | 6.8 *Executory Contracts and Unexpired Leases* | 18 |
| VII. | **LIQUIDATION AND FINANCIAL ANALYSIS** | 19 |
| | 7.1 *Best Interest of Creditors and Comparison with Chapter 7 Liquidation* | 19 |
| | 7.2 *Feasibility of the Plan.* | 20 |
| |    A) Financial Projections | 20 |
| |       a) Personal Property | 21 |
| |       b) Accounts Receivable and Liquidated Debts | 21 |
| |       c) Liquidation Analysis | 21 |
| | 7.3 *Pending Litigation and Other Liabilities.* | 21 |
| VIII. | **BAR DATE AND DETERMINATION OF CLAIMS** | 22 |
| | 8.1 *Bar Date.* | 22 |
| | 8.2 *Determination of Claims* | 22 |
| IX. | **ALTERNATIVES TO THE PLAN** | 23 |
| |    A. Liquidation under Chapter 7 | 23 |
| |    B. Dismissal of the Case | 24 |
| |    C. Alternative Plan of Reorganization | 24 |
| X. | **TAX EFFECTS** | 24 |
| XI. | **CONCLUSION** | 24 |

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

**Case No. 15-01627 (MCF)**
Page 3

## LIST OF EXHIBITS

Exhibit AA-1 – Motion for Sale of Assets Unser Section 363 (b)...............................................6
Exhibit AA-2 – Bidding Procedures.........................................................................................6
Exhibit AA-3 – Settlement Agreement with BPPR....................................................................7
Exhibit A-1 and A-2(Ballots)...................................................................................................8
Exhibit B - Order Approving Disclosure Statement.................................................................10
Exhibit C- Summary of Claims and Plan Payments................................................................13
Exhibit D- Summary of Priority Tax Claims ...........................................................................16
Exhibit E- Estimated Liquidation Proceeds Distribution.........................................................18
Exhibit F- Liquidation Analysis .............................................................................................19
Exhibit G - Financial Statements as of March 31, 2014 ........................................................21
Exhibit H – Appraisal Report..................................................................................................21

# I.   INTRODUCTION

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy Code"), San Juan Resort Owners, Inc., debtor and debtor-in-possession in the above captioned case ("Debtor"), provides this Disclosure Statement (the "Disclosure Statement") to all of Debtor's known creditors. The purpose of the Disclosure Statement is to provide such information the Debtor believes may be deemed necessary for Debtor's creditors to make an informed decision in exercising their rights to vote on Debtor's Liquidation Plan (the "Plan"), dated as of the date of the Disclosure Statement.  The Plan is being filed with the United States Bankruptcy Court for the District of Puerto Rico ("Bankruptcy Court") simultaneously herewith.

The Debtor recommends that you vote to accept the Plan.  Each creditor must, however, review the Plan and the Disclosure Statement carefully, including all Exhibits in their entirety, and determine whether or not to accept or reject the Plan based upon that creditor's independent judgment and evaluation.  The description of the Plan in the Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.  Capitalized terms not otherwise defined herein have the same meaning as set forth in the Plan; other terms shall have the meaning ascribed to them in the Bankruptcy Code.

The information contained in the Disclosure Statement has been provided by Debtor based upon Debtor's knowledge of its records, business, and affairs.  Except as otherwise expressly indicated herein, the information provided in the Disclosure Statement has not been subject to an audit or independent review. Although great efforts have been made to be accurate, the Debtor and their Counsel, and other professional advisors do not warrant the accuracy of the information contained herein.

The Disclosure Statement has not yet been approved by the Bankruptcy Court as providing information deemed adequate to permit Debtor's creditors to make an informed judgment in exercising their right to vote for or against the Plan.

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

**Case No. 15-01627 (MCF)**
Page 5

No representations concerning Debtor, including the value of its assets, or the aggregate dollar amount of claims which may be allowed, are authorized other than as set forth in the Disclosure Statement.Any representations, warranties, or agreements made to secure acceptance or rejection of the Plan by Debtor's creditors that differ from those contained in the Disclosure Statement should not be relied upon in voting on the Plan.

The Debtor believes that the Plan provides the quickest recovery and will maximize the return to creditors on their Claims.**ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

## II.    SUMMARY OF THE PLAN

The Plan specifies the manner in which the Claims and the Interests in Debtor are to be treated. Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified for purposes of voting under the Plan, but the Plan does provide for the treatment of such Claims.  Further, the Plan and Disclosure Statement contain a summary of the Sale Transaction detailed in the Sale Motion filed in Docket No. 21and of the agreements reached with Banco Popular de PR("BPPR")(the Settlement Agreement attached to the Sale Motion), with the Stalking Horse Purchaser (the Asset Purchase Agreement ("APA") attached to the Sale Motion), and the Bid Procedures.  To the extent of any inconsistency between the Disclosure Statement and Plan in regards to the terms of the sale of Debtor's Assets and/or the Settlement Agreement with BPPR, the Sale Documents (as defined in the Sale Motion), and the Settlement Agreement shall control.  As to all other matters disclosed and included in the Disclosure Statement, the Plan shall control.  The following table presents a Summary of Debtor's Plan:

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

**Case No. 15-01627 (MCF)**
Page 6

| DESCRIPTION OF CLAIM | CLASS | ESTIMATED AMOUNT OF ALLOWEDCLAIM | TREATMENT AND ESTIMATED RECOVERY UNDER THE PLAN |
|---|---|---|---|
| Holders of Allowed Administrative Expense Claims (Estimated) | N/A | $141,950.00 | Unimpaired.<br><br>Estimated Recovery: 100%<br><br>Except as otherwise agreed to by Debtor and the Holder of Allowed Administrative Expense Claim, including the estimated notarial fees and transfer costs from the sale of Debtor's assets, as explained below, each such Holder shall be paid in full by Debtor on or before the Effective Date of the plan. Payments to Professionals will be made as approved by the Bankruptcy Court during the pendency of the Chapter 11 Case. US Trustee Quarterly fees will be continued to be paid when due, with any balances paid on or before the Effective Date of the Plan. These payments will be made from the Carve-Out agreed with BPPR as part of the Sale Motion (Docket No. 21). |
| Holders of Allowed Priority Tax Claims Secured and Unsecured | N/A | $991,737.52 | Unimpaired.<br><br>Estimated Recovery: 100%<br><br>Holders of Allowed Priority Tax Claims, basically composed of Room Taxes due to the Tourism Company of Puerto Rico and the secured claim of CRIM, will be paid in full (as may be reduced to an acceptable amount to such Holders of Allowed Priority Tax Claims) in cash, on or before the Effective Date of the Plan, out of the Carve-Out agreed to as part of the Sale Motion (Docket No. 21), as further explained below. |
| The Secured Claims of Banco Popular de P.R ("BPPR") | Class 1 | $17,563,042.12 | Impaired<br><br>Estimated Recovery: 44%<br><br>Subject to the approval of Debtor's Motion for the Sale of its Assets (the "Sale Motion", or Docket No. 21) attached hereto as the **Exhibit AA-1** and of the Bidding Procedures in **Exhibit AA-2**, Debtor's Plan contemplates the sale of substantially all of its assets as set forth in the Sale Motion, basically composed of Debtor's real estate, under the provisions of 11 U.S.C.§363(b), for an amount not less than $9,039,557, free and clear of all liens and encumbrances. The sale transaction will also contemplate the sale of certain assets of Debtor's Affiliate (Premier Hotel Management, Inc.), in the amount of approximately $410,443.00, needed for the operations of the Hotel. The terms of the sale are as set forth in the Sale Motion and its exhibits.<br><br>From the proceeds of the sale of Debtor's assets, Debtor will pay in cash 100% of the Allowed Administrative Expense Claims, 100% of the Allowed Priority Tax |

San Juan Resort Owners, Inc.
*Disclosure Statement*

Case No. 15-01627 (MCF)
Page 7

| | | | |
|---|---|---|---|
| | | | Claims (Secured and Unsecured), and a minimum net payment of $7,855,869[1] to BPPR as per the agreement reached with this secured creditor as further disclosed in the **Exhibit AA-3** hereto and the Sale Motion, and will reserve a carve-out of approximately $50,000, to pay the Allowed General Unsecured Claims on a pro-rata basis.<br><br>BPPR's deficiency claim will be dealt under Class 2 below of General Unsecured Creditors, entitled to vote under such Class, but not receiving dividends out of the carve out reserved for the General Unsecured Creditors.[2]<br><br>If a result of the Bidding Procedures, the sale price for Debtor's assets is increased or there is any saving in the estimated transfer costs, the excess over the carve outs set forth above will be paid to BPPR pursuant to the agreement set forth in Exhibit AA-3. |
| Holders of Allowed General Unsecured Claims | Class 2 | $14,459,439.70 | Impaired.<br><br>Estimated Recovery: .5%<br><br>Holders of Allowed General Unsecured Claims, including those arising from rejected executory contracts, if any, but excluding BPPR's deficiency claim (subject to compliance with the Sale Documents, as defined in the Sale Motion), will be paid in full satisfaction of such Claims on the Effective Date approximately .5% thereof, from a $50,000.00 carve out to be reserved from the proceeds of the sale of Debtor's assets, as set forth above. |
| Interests in Debtor | Class 3 | N/A | Impaired.<br><br>Estimated Recovery: N/A<br><br>The Holders of the Equity Interests in Debtor will not receive any distribution under the Plan.<br><br>Debtor's common shares will be cancelled within 120 days after the Effective Date, as Debtor's operations will cease after the sale of its assets. |

For a more detailed description of the treatment of the foregoing Claims and Interests, see "Treatment of Claims and Interests under the Plan".

---

[1] A difference of $2,061.00 exists between this amount and that reflected in the Sale Motion. This difference will be paid by the Debtor from the balance of its Debtor in Possession bank account on or before the Effective Date of the Plan.

[2] Subject to the compliance with the Sale Documents and other agreements by and between the parties.

San Juan Resort Owners, Inc.                                    Case No. 15-01627 (MCF)
*Disclosure Statement*                                                      Page 8

The Disclosure Statement has been prepared by Debtor to provide creditors with adequate information so that they can make an informed judgment about the Plan. Each creditor should read the Disclosure Statement and the Plan in their entirety before voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to the Disclosure Statement and no person has been authorized to utilize any information concerning Debtor's assets other than the information contained herein for purposes of solicitation.

## III.   INFORMATION ABOUT THE REORGANIZATION PROCESS

### 3.1   Purpose of a Disclosure Statement

This Disclosure Statement includes background information about Debtor and identifies how creditors have been placed in the Plan. The Disclosure Statement describes the proposed treatment of Debtor's creditors if the Plan is confirmed and contains information concerning the prospects in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon its approval by the Bankruptcy Court, the Disclosure Statement and the Exhibits thereto will have been found to contain, in accordance with the provisions of the Bankruptcy Code, adequate information of a kind and in sufficient detail to enable a reasonable, hypothetical investor, typical of a holder of an impaired claim or an interest to make an informed judgment about the Plan. Approval of the Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

### 3.2   Voting Procedure

Creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing, and causing the Ballot Form accompanying this Disclosure Statement as **Exhibits A-1 and A-2** to be returned to the following address:

**SAN JUAN RESORT OWNERS, INC.**
**c/o William Vidal Carvajal Law Office, P.S.C.**
**MCS Plaza, Suite 801, Ponce de León Ave.**
**San Juan, PR  00918**

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

**Case No. 15-01627 (MCF)**
Page 9

The Ballots must be received **on or before 4:00 P.M. (Eastern Standard Time) on** _____,
**2015,** to be counted in the voting. Ballots received after this time will not be counted in the voting unless
the Bankruptcy Court so orders. The Debtor recommends a vote for "ACCEPTANCE" of the Plan.

**3.3      Ballots**

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests
which are "impaired" under the terms and provisions of a plan are entitled to vote to accept or reject such
plan, except as provided in Section 1126(g) of the Bankruptcy Code as to any Class which is deemed not
to have accepted the Plan because the Plan provides that the claims or interests of such class do not entitle
the holders of such claims or interests to receive or retain any property under the Plan on account of such
claims or interests.

Members of Classes 1 and 2 are impaired under the Plan and entitled to vote. They will be asked
to vote for acceptance or rejection of the Plan.

**3.4      The Confirmation Hearing**

Pursuant to Section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a
hearing on confirmation of the Plan to commence on _____, **2015** at _____ .M. or as soon
thereafter as the Debtor can be heard.   The Confirmation Hearing will be held before the
Honorable Mildred Cabán Flores, United States Bankruptcy Judge, in the United States
Bankruptcy Court, Courtroom 3, 300Recinto Sur Street, San Juan, Puerto Rico, 00901.  At the
Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various
requirements of the Bankruptcy Code, including whether it is feasible and in the best interests of
holders of claims and interests.  The Bankruptcy Court will also receive and consider a Report of
Plan Voting prepared by Debtor, summarizing the votes for acceptance or rejection of the Plan
by Debtor entitled to vote.

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

**Case No. 15-01627 (MCF)**
Page 10

The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

At the Confirmation Hearing with respect to the Plan, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for the impaired Class, (ii) hear and determine objections, if any, to the Plan and to the confirmation of the Plan, that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing, filed and served as required by the Bankruptcy Court pursuant to the order approving the Disclosure Statement, a copy of which is attached as **Exhibit B** hereto.

**3.5      Acceptances Necessary to Confirm the Plan**

The vote of each holder of the impaired Class is important since at the Confirmation Hearing and as a condition to the confirmation of the Plan, the Bankruptcy Court must determine, among other things, whether the impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, the impaired Class will be deemed to have accepted the Plan if at least 2/3 in amount and more than 1/2 in number of the Allowed Claims of the impaired Class members who actually cast ballots to accept or reject the Plan, accept the Plan.  Further, unless there is acceptance of the Plan by all members of the impaired Class, the Bankruptcy Court must also determine that under the Plan, such Class members will receive property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. **THESE CALCULATIONS ARE BASED ONLY ON THE CLAIMS AMOUNTS AND NUMBER OF CREDITORS WHO ACTUALLY VOTE.  ANY BALLOT THAT IS VALIDLY EXECUTED THAT DOES NOT CLEARLY INDICATE REJECTION OF THE PLAN, SHALL BE DEEMED TO CONSTITUTE A VOTE FOR ACCEPTANCE OF THE PLAN.  THE VOTE OF EACH CREDITOR IS IMPORTANT.**

# IV.   GENERAL INFORMATION

**4.1     Description and Historical View of the Debtor.**

Debtor was incorporated under the laws of Puerto Rico on January 18, 2007.  On March 15, 2007, through an Asset purchase Agreement executed by and between Debtor and Phoenix Hotel Management, Inc.; Debtor acquired the real estate known as San Juan Beach Hotel (the "Hotel").  On that same date, Debtor entered into a management agreement with Global Management, Inc. ("Global") for the administration of the Hotel's operations in exchange for a monthly rent equivalent to the debt service paid to the secured creditor (related to the acquisition of the Hotel), plus the real property insurance and real property taxes.  Global ceased operations on February 28, 2010.  Effective March 1, 2010, a new rent agreement was executed with Premier Hotel Management, Inc., ("Premier").  It must be underscored that Premier is the owner of Hotel's air conditioners, power generators, as well as all other equipment located at the realty such as the electronic equipment, computers, leasehold improvements, and others.

Effective November 2014, the rent agreement with Premier was modified to reduce the monthly rent to $20,000 per month, due to the economic crisis been suffered by such affiliate, which impedes it to pay the Debtor the monthly rents.

The purchase of the Hotel was financed by Westernbank, Puerto Rico ("Westernbank") and a capital contribution of $165,000 from Debtor's shareholders.  From the acquisition date until April 2010, Debtor was in compliance with the Loan Agreement executed with Westernbank.  Due to the economic downturn and recession Puerto Rico has been facing during the last years, the occupancy rates and revenues at Hotel have been affected (sometimes at rates under 30% occupancy), resulting that Debtor was unable to comply with its loan agreement with Westernbank.

**4.2     Events Preceding Debtor's Chapter 11 Filing**

The economic downturn and recession Puerto Rico has been facing during the last years has adversely impacted numerous sectors of the Puerto Rico economy, including the hospitality business sector.  This, coupled with a high leverage ratio resulting from the loans for the acquisition of the Hotel,

caused difficulties to Debtor in meeting its obligations in the ordinary course of its business. Debtor's actual revenues have been substantially lower than projected on the acquisition's date, thus affecting Debtor's cash flows, necessary to comply with Debtor's obligations.

Consequently, for the purpose of reorganizing its business and financial affairs, obtain the benefits of the automatic stay provisions of Section 362(a) of the Bankruptcy Code and a breathing spell from the actions which were causing Debtor and its managerial team to defensively operate, on March 5, 2015, Debtor filed a voluntary petition for relief pursuant to 11 U.S.C. Chapter 11 with the Bankruptcy Court.

**4.3     Debtor's Post-Petition Endeavors.**

As a result of the filing by Debtor of its Chapter 11 petition, Debtor received the benefits of 11 U.S.C. § 362(a), which stays all collection actions and judicial proceedings against Debtor, thus preventing a run to the court house by creditors and the possible execution of its assets, providing Debtor the opportunity to file a Liquidation Plan and a Disclosure Statement, without the pressures that drove Debtor into Chapter 11, as envisioned by the Bankruptcy Code.

During the course of its case, Debtor has undertaken the following efforts for the benefit of its Estate and its creditors:

Debtorsought and obtained the Bankruptcy Court's approval to retain William Vidal Carvajal Law Office, PSC, as its bankruptcy counsel.

Debtoralso sought the Bankruptcy Court's approval to retain Luis R. Carrasquillo, CPA, CIRA ("Carrasquillo") as its financial advisor on all matters pertaining to Debtor's Chapter 11 case (pending approval).

On March 27, 2015 (Docket 21), Debtor file a Motion for the Sale of substantially all of its assetsunder the provisions of 11 U.S.C.§363(b) pursuant to the agreement reached with BPPR and the Bid Procedures as set forth in the **Exhibits AA-1, AA-2,  and AA-3** hereto, as an orderly liquidation of its assets.

## V.     CLAIMS AGAINST DEBTOR

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

Case No. 15-01627 (MCF)
Page 13

### 5.1    Claims Against Debtor

Claimsagainst Debtor that are Allowed Claims,as defined in the Plan, will be entitled to Distribution pursuant thereto, as indicated in pages 6 and 7 hereof.

The Plan provides that only Holders of Allowed Claims, that is, holders of Claims not in dispute, not contingent, liquidated in amount and not subject to objection or estimation are entitled to receive distribution thereunder. Until a claim becomes an Allowed Claim, distribution will not be made to the holder of such claim.

### 5.2    Objections to Claims

The amounts set forth as due to holders of unclassified and classified claims are estimates, based upon Debtor's Schedules or Debtor'sbelief as to the amounts due thereto. Debtor isincluding as **Exhibit C** hereto a Summary of Claims and Plan Payments.

Any objections to Claims must be filed and served on their holders by the Claims Objection Bar Date, which as set forth in the Plan is thirty (30) days before the first date fixed by the Bankruptcy Court for the hearing on the confirmation of Debtor's Plan. If an objection has not been filed to a Claim by the Claims Objection Bar Date, the Claim will be treated as an Allowed Claim.

Objections to Claims filed in Debtor's Chapter 11 case are to be prosecuted by Debtor, including any application to estimate or disallow Claims for voting purposes.

As of the date of this Disclosure Statement Debtor has not filed any objections to claims.

## VI.    DESCRIPTION OF THE PLAN

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by said provisions. In the event and to the extent that the description of the Plan contained in the Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence. Further, the Plan and Disclosure Statement contain a summary of the Sale Transaction detailed in the Sale Motion filed in Docket No. 21 and of the agreements reached with BPPR (the Settlement Agreement attached to the Sale Motion), with the Stalking Horse Purchaser (the APA attached to the Sale Motion), and the Bid Procedures. To the extent of any inconsistency between the Disclosure

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

Case No. 15-01627 (MCF)
Page 14

Statement and Plan in regards to the terms of the sale of Debtor's Assets and/or the Settlement Agreement with BPPR, the Sale Documents (as defined in the Sale Motion), and the Settlement Agreement shall control. As to all other matters disclosed and included in the Disclosure Statement, the Plan shall control.

Debtor's Plan contemplates, subject to the approval of the Court, the sale of substantially all of Debtor's assets under the terms of the Sale Motion, basically composed of Debtor's real estate, under the provisions of 11 U.S.C.§363(b), for at least $9,039,557 free and clear of all liens and encumbrances.

From the proceeds of the sale of such assets and the Carve-Out (as defined in the Sale Motion) agreed to with BPPR, Debtor will pay the Allowed Administrative Expense Claims, including those related to the sale of the assets; Allowed Priority Tax Claims (Secured and Unsecured); and a net and minimum Settlement Payment (as defined in the BPPR Settlement Agreement) of $7,855,869[3] to BPPR as per the agreement reached with this secured creditor, as further disclosed in the Exhibit AA-3 hereto, and will reserve approximately $50,000, to pay the Allowed General Unsecured Claims on a pro-rata basis. BPPR's deficiency claim, will be dealt under Class 2 of General Unsecured Creditors, entitled to vote under such class but, subject to the prior satisfaction of the terms and conditions in the Sale Documents, not receiving dividends out of the carve out reserved for the General Unsecured Creditors. Any excess of the final sales price, as a result of the bidding procedures; as well as any savings in the other costs and claims, will be paid to BPPR, as an additional payment of its secured claims, under the terms of the BPPR Settlement Agreement.

Prior to any distribution to General Unsecured Creditors, Debtor will pay in full, on or before the Effective Date of the Plan, any pending Allowed Administrative Expense Claims and the Allowed Priority Claims.

**6.1     Unclassified Claims**

---

[3] A difference of $2,061.00 exists between this amount and that reflected in the Sale Motion. This difference will be paid by the Debtor from the balance of its Debtor in Possession bank account on or before the Effective Date of the Plan.

**San Juan Resort Owners, Inc.**                          Case No. 15-01627 (MCF)
*Disclosure Statement*                                           Page 15

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Claims are not classified in the Plan. A description of the unclassified Claims and the Claims of General Unsecured Creditors, as well as the estimated principal amounts thereof, as of the Effective Date, and their treatment, are set forth in the Plan and summarized in pages 6 and 7 hereof.

Administrative Expense Claims are generally the ordinary and necessary costs of administering and operating during a Chapter 11 case, including claims under section 503(b)(9) of the Bankruptcy Code. These claims are listed in **Exhibit C** hereto.

Except as otherwise agreed to by Debtor and the holder of a pending Allowed Administrative Expense Claim, each such holder shall be paid in full on or before the Effective Date. US Trustee Fees will paid when due, during the pendency of the case.

If Debtor disputes any portion of an Administrative Expense Claim, Debtor shall pay such Claim within thirty (30) days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim. Debtor will reserve the necessary funds to meet these payments.

**6.2    Professional Fee Claims**

The professionals retained by Debtor in its Chapter 11 case have and will incur fees and expenses from the date of their retention through the Effective Date of the Plan. It is impossible to predict the amount of professional administrative expense fees that will be incurred through the confirmation of the Plan. As of the filing of this Disclosure Statement, Debtor has paid approximately $50,000 in professional fees, comprised basically of the retainer fees paid for Debtor's appointed professionals. Debtor estimates that additional Allowed Professionals Fee Claims will aggregate from $75,000 to $100,000 for services rendered and expenses incurred up to the Confirmation of the Plan, for all professionals retained by Debtor. All amounts paid to professionals through the Confirmation Date, including interim fees and expenses are subject to final Bankruptcy Court approval. Debtor reserves the right to contest the allowance of any professional fees. Payments to Professionals will be made as approved by the Bankruptcy Court during the pendency of the Chapter 11 Case

**6.3    Priority Tax Claims and Other Priority Claims**

Priority Tax Claims consists of Claims entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims consist principally of room taxes owed to the Tourism Company of Puerto Rico and the Secured Claim of CRIM.

The estimated Priority Tax Claims for $991,737.52.00, is listed in **Exhibit D** hereto. The Holders of Allowed Priority Tax Claims, basically composed of Room Taxes due to the Tourism Company of Puerto Rico and the secured claim of CRIM, will be paid in full (as may be reduced to an acceptable amount to such Holders of Allowed Priority Tax Claims) in cash, on or before the Effective Date of the Plan, out of the Carve-Out agreed to as part of the Sale Motion (Docket No. 21), as further explained below.

**6.4    Classes of Claims and Equity Interests**

As of the Petition Date, Debtor had priority unsecured and non-priority unsecured debts, as more particularly described below and in pages 6-7 hereof.The Plan classifies the Claims of General Unsecured Creditors as Class 2. A description of said Class and Class 3, Holders of the Equity Interests in Debtor and their treatment are set forth below, as follows:

Class 1 – Consists of the Allowed Claim of Banco Popular de P.R.

Class 2 – Consists of the Holders of Allowed General Unsecured Claims.

Class 3 – Consists of the Holders of the Shares in Debtor.

**6.5    Treatment of Claims.**

**Class 1 –The Secured Claims of Banco Popular de PR ("BPPR")**

(a) <u>Impairment and Voting</u> - Class 1 is impaired under the Plan. BPPR is entitled to vote to accept or reject the Plan.

(b) <u>Distribution</u> –Subject to the approval of Debtor's Motion for the Sale of Assets attached hereto as the **Exhibit AA-1** and of the Bidding Procedures in **Exhibit AA-2**, Debtor's Plan contemplates the sale of substantially all of its assets, basically composed of Debtor's real estate, under the provisions of 11

**San Juan Resort Owners, Inc.**
*Disclosure Statement*

**Case No. 15-01627 (MCF)**
Page 17

U.S.C.§363(b), for an amount not less than $9,039,557, free and clear of all liens and encumbrances. The sale transaction will also contemplate the sale of certain assets of a Debtor's Affiliate (Premier Hotel Management, Inc.), in the amount of approximately $410,443.00. , needed for the operations of the Hotel.

From the proceeds of the sale of Debtor's assets and specifically the Carve-Out (as defined in the BPPR Settlement Agreement), Debtor will pay in cash 100% of the Allowed Administrative Expense Claims, 100% of the Allowed Priority Tax Claims (Secured and Unsecured)(as may be reduced by agreement with the Holders of such Allowed Priority Tax Claim), and a net and minimum Settlement Payment (as defined in the BPPR Settlement Agreement) of $7,855,869[3]to BPPR as per the agreement reached with this secured creditor as further disclosed in the **Exhibit AA-3** hereto, and will reserve a carve-out of approximately $50,000, to pay the Allowed General Unsecured Claims on a pro-rata basis. BPPR's deficiency claim will be dealt under Class 2 of General Unsecured Creditors, entitled to vote under such Class, but, subject to the satisfaction of the terms and conditions under the BPPR Settlement Agreement, not receiving dividends out of the carve out reserved for the General Unsecured Creditors.

If a result of the Bidding Procedures, the sale price for Debtor's assets is increased or there is any saving in the estimated transfer costs, the increase in sales price and/or excess over the carve outs set forth above will be paid to BPPR pursuant to the agreement set forth in Exhibit AA-3.

**Class 2 –Holders of Allowed General Unsecured Claims**

(a) <u>Impairment and Voting</u> - Class 2 is impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.  For voting purposes, the class includes BPPR's deficiency claim, which is entitled to vote and is impaired.

(b) <u>Distribution</u> – The Holders of Allowed General Unsecured Claims, including those arising from rejected executory contracts, subject to the satisfaction of the terms and conditions of the BPPR Settlement Agreement, and as to distributions only, excluding BPPR's deficiency claim, will be paid in

**San Juan Resort Owners, Inc.**                                    **Case No. 15-01627 (MCF)**
*Disclosure Statement*                                                                Page 18

full satisfaction of such Claims on the Effective Date .5% approximately of their allowed claims, from the

$50,000 carve-out to be reserved from the proceeds of the sale of Debtor's assets as set forth above.

**Class 3 – Interests Holders in Debtor**

(a)    Impairment and Voting - Class 3 is impaired under the Plan, is deemed to have rejectedthe Plan due to

the treatment indicated below, as provided for in Section 1126 (g) of the Bankruptcy Code.

(b)    Distribution – The Holders of the Equity Interests in Debtor will not receive any distributions

under the Plan.  Debtor's common shares will be cancelled within 120 days from the Effective Date, as

Debtor's operations will cease after the sale of its assets.

**6.6    Means for Implementation of the Plan**

Except as otherwise provided in thePlan, Debtor will effect payments of pending Administrative

Expense Claims, on or before the Effective Date.  Priority Tax Claims will be paid in full(as indicated

above) in cash, on or before the Effective Date.  General Unsecured Claims will be paid on a pro-rata

basis, out of the carve-out reserved from the sales proceeds, amounting to $50,000, on the Effective Date.

All of the aforementioned Allowed Claims, as well as Class 1 Claims, will be paid fromthe

Carve-Out (as detailed in the Sale Motion) agreed from the sale of Debtor's assets.  Debtor's sales

proceeds distribution isdetailed as **Exhibit E**hereto.

**6.7    Debtor's Post Confirmation Management**

Since Debtor operations will cease after the liquidation of substantially all of Debtor's assets,

Debtor will not have a need for any management thereafter.  Nevertheless until such time, Debtor's

current management and their compensation will continue as follows:

| Mr. Luis A. Carreras Pérez | President | No Compensation |
|---|---|---|

**6.8    Executory Contracts and Unexpired Leases**

All executory contracts and unexpired leases which have not expired by their own terms or have

been rejected on or prior to the Confirmation Date shall be deemed rejected on the Effective Date and the

entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

If the rejection of such executory contracts or unexpired leases results in a claim for damages bythe other party or Debtor to such contracts or leases, any claim for such damages, if not evidenced by a filed proof of claim, shall be forever barred and will not be enforceable against the Estate, or its properties, its agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for Debtor on or before forty-five (45) days following the Confirmation Date. Debtorretains the right to furtherobject to any rejection damages claims filed in accordance with this Section.

## VII.   LIQUIDATION AND FINANCIAL ANALYSIS

**7.1    Best Interest of Creditors and Comparison with Chapter 7 Liquidation**

In the event Debtor'sChapter 11 case is converted to Chapter 7 of the Bankruptcy Code, Debtor would be required to cease all activities and a Chapter 7 Trustee would be appointed for Debtor's Estateto liquidate the Estate's assets pursuant to the provisions of the Bankruptcy Code, after attending to the immediate issues of securing Debtor's assets and the resolution of any issues involving Debtor's executory contracts.

A Liquidation Analysis with respect to Debtor's assets as of the filing date is attached as **EXHIBIT F**hereto (the "Liquidation Analysis").

The Liquidation Analysis reveals that in the event of a liquidation of Debtor'sassets by a Chapter 7 Trustee, there would be a substantial loss to Debtor's Estate, taking into account the Chapter 7 costs of administration, the decrease in the recovery from the liquidation of Debtor's assets and the expected value of the Estate's assets in a Chapter 7 scenario.  It also reflectswhat in Chapter 11 the respective Creditors are expected to receive under the Plan versus what is projected they would receive in Chapter 7, underscoring the benefits of the confirmation of the

Plan and its effectiveness.   Pursuant to such analysis, under a Chapter 7 scenario, Chapter 7 Administrative Expense Claims, Priority Tax Claimants, Chapter 11 Administrative Expense Claims, and General Unsecured Creditors would not receive any dividends of their allowed claims.In accordance to the analysis, in a Chapter 7 liquidation, BPPR would receive 44% of its allowed leaving no funds for the payment of any other creditors in the case.

Confirmation of the Plan will ensure that holders of Administrative Expense Claims, Allowed Priority Claims, and Allowed General Unsecured Claims will receive prompt dividends on their claims, as set forth above, since as part of the Sale Documents, BPPR has consented to a Carve-Out, which will fund some of the payments set herein; Carve-Out that would not be available to creditors in the absence of the approval of the Sale Motion and confirmation of the Plan.   Moreover under the Plan it is estimated that General Unsecured Creditors will receive .5% of their allowed Claims, while Priority Tax Claimants and Chapter 11 Administrative Expense Claims will receive 100% of their claims. The dividend for the General Unsecured Claims may increase, depending on the objection to various claims that may be filed during the pendency the case.

The Liquidation Analysis contains estimates and assumptions that, although developed and considered reasonable by Debtor,are inherently subject to significant economic uncertainties and contingencies beyond Debtor'scontrol.

## 7.2    Feasibility of the Plan

### A)    Financial Projections

Debtor,with the assistance of its Court appointed financial consultant, hasprepared an Analysis of the Distribution of the Liquidation Funds (**Exhibit E**).   Such analysisis based upon estimates and assumptions that, although developed and considered reasonable by Debtor are inherently subject to significant economic uncertainties and contingencies beyond Debtor's control, as well as tocertainassumptions as to the value of Debtor's assetsthat are subject to change.   Accordingly, there can be no assurance that the projected performance reflected in such Analysis will be realized.

As of the Petition Date, Debtor owned assets and had liabilities, as more particularly described in its Schedules and Statement of Financial Affairs, filed with the Bankruptcy Court on March 5, 2015. Debtor's Schedules and Statement of Financial Affairs are available for public inspection at the office of the Clerk of the Bankruptcy Court during regular business hours.

### a) Personal Property

As of the Petition Date, Debtor's Schedules listed Debtor's personal property consisting of cash, bank accounts, and accounts receivable, with an aggregate value of $1,889,171. However, such assets are either part of the collateral of BPPR or accounts considered uncollectible. A Detail of Debtor's personal property is included in its Schedule B, available for public inspection at the office of the Clerk of the Bankruptcy Court during regular business hours.

### b) Accounts Receivable and Liquidated Debts

As of the filing date, Debtor listed, in its Schedule B, accounts receivable with an estimated balance of $1,876,344. An updated recoverability analysis of Debtor's accounts receivable appears in the Liquidation Analysis mentioned above.

### c) Liquidation Analysis

In order to analyze realistic liquidation scenarios and considering the updated value of Debtor's assets as of the filing date, Debtor has included the Liquidation Analysis as **Exhibit F** hereto. **Exhibit G** hereto, consists of Debtor's Compiled Financial Statements as of March 31, 2014. **Exhibit H** presents the last available appraisal report of Debtor's realty, including the estimated liquidation value.

### 7.3  Pending Litigation and Other Liabilities

At the time of the filing of the Chapter 11 petition, the following cases were pending and were stayed by the provisions of Section 362(a) of the Bankruptcy Code:

| Case/ Name | Nature | Forum | Status |
|---|---|---|---|
| Banco Popular de Puerto Rico vs. San Juan Resort Owners, Inc.; C.L. of Puerto Rico, Inc.; Global Hotel Management, Inc.; Luis A. Carraras Pérez<br><br>Civil No. KCD2012-0328 (906) | Collection of Money and Foreclosure Action | Superior Court of Puerto Rico, San Juan Section | Stayed |
|  |  |  |  |

San Juan Resort Owners, Inc.                                    Case No. 15-01627 (MCF)
*Disclosure Statement*                                                        Page 22

| Compañía de Turismo de Puerto Rico vs. San Juan Resort Owners, Inc.; Premier Hotel Management, Inc.; Global Hotel Management, Inc., D/B/A San Juan Beach Hotel; Sr. Luis A. Carreras, Jane Doe y La Sociedad Legal de Ganaciales Compuesta por Ambos, Sr. José Carreras Perez, Jane Doe y La Sociedad Legal de Ganaciales Compuesta por Ambos; Sr. Gonzalo Gracia, Jane Doe y La Sociedad Legal Gananciales Compuesta por Ambos; Compañías de Fianza, A, B, y C; Compañías Aseguradoras D, E, y F; John Doe.<br><br>Civil No. KCD2014-1799 | Collection of Money | Court of First Instance of Puerto Rico, San Juan Section | Stayed |
|---|---|---|---|
| Cadillac Uniform&LinenSupply, Inc. vs Global Hotel Management, Inc., h/n/c San Juan Beach Hotel; San Juan Resort Owners, Inc.; Luis Carreras Pérez y su esposa, Fulana de Tal; la Sociedad de Bienes Gananciales compuestas por ambos.<br><br>Civil No. KAC2014-0137 | Collection of Money | Court of First Instance of Puerto Rico, San Juan Section | Stayed |
| Boutique Hotels, Inc.; Gonzalo Gracia De Miguel vs. Luis Carreras Pérez, San Juan Resort Owners, Inc.; Condado San Juan Hotel 2, LLC<br><br>Civil No. KAC14-0989 | Breach of Contract and Damages | Court of First Instance of Puerto Rico, San Juan Section | Stayed |
| Ramarod Inc. y Tommy R. Habibe Arias vs. Doramar Development, Inc.; San Juan Resort Owners, Inc.; Luis Carreras (Padre) Luis Carreras (Hijo), José Carreras; Fulano de Tal; ABC Insurance Company | Breach of Contract and Damages | Court of First Instance of Puerto Rico, San Juan Section | Stayed |

# VIII.  BAR DATE AND DETERMINATION OF CLAIMS

**8.1    Bar Date**

On March 9, 2015 (Docket No. 10), in the "Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors and Deadlines" issued in Debtor's case, the Bankruptcy Court fixed July 9, 2015, as the bar date for the filing of proofs of claims and interests (except for Governmental Units), and September 8, 2015, for such filings by Governmental Units.

**8.2    Determination of Claims**

The Plan specifies procedures for objecting to claims. Debtor may object to Claims within thirty (30) days before the first date fixed by the Bankruptcy Court for the hearing on the confirmation of the

Case:15-01627-MCF11    Doc#:50    Filed:04/17/15    Entered:04/17/15 12:19:38    Desc: Main
Document    Page 23 of 50

San Juan Resort Owners, Inc.
*Disclosure Statement*

Case No. 15-01627 (MCF)
Page 23

Plan. No payments will be made under the Plan on account of Disputed Claims until their allowance by the Bankruptcy Court. The Plan provides that Distributions on Disputed Claims will be held in reserve until the Disputed Claims are allowed (at which time the reserves will be distributed and the Claims will be treated according to the terms of the Plan), or disallowed (at which time the reserves will be distributed on account of Allowed Claims pursuant to the terms of the Plan).

Any Claims which (a) are not listed as an Allowed Claims on Debtor's Schedules, as amended; (b) are not evidenced by a valid, timely filed Proof of Claim; or (c) are not listed in the Plan or exhibits to the Plan as Allowed Claims, shall not receive any distribution of cash or property under the Plan until the same become Allowed Claims, and shall be disallowed and discharged if they are not Allowed by Order of the Bankruptcy Court.

## IX.    ALTERNATIVES TO THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) Debtor's liquidation under Chapter 7 of the Bankruptcy Code, (b) dismissal of Debtor's Chapter 11 Case, or (c) the proposal of an alternative plan.

### A.    Liquidation under Chapter 7

If the Plan cannot be confirmed, the Case may be converted to Chapter 7 of the Bankruptcy Code. In such an event, a trustee would be elected or appointed to liquidate Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.

As set forth in the Liquidation Analysis attached as **Exhibit F** hereto, Debtor believes that conversion of the Case to Chapter 7 of the Bankruptcy Code would result in a limited (none other than to the Secured creditor) distribution to creditors, due to the decreased value of Debtor's assets, the unfamiliarity of a trustee with Debtor's business and the manner of most effectively disposing of Debtor's assets, the carrying costs of certain assets such as insurance, property taxes, etc., and the delay in distribution on account of such conversion.

Thus, Debtor believes that the interest of creditors and the goals of Chapter 11 are better served by the confirmation of the Plan.

San Juan Resort Owners, Inc.                                      Case No. 15-01627 (MCF)
*Disclosure Statement*                                                        Page 24

### B.    Dismissal of the Case

Dismissal of the Case would likely create substantial problems for all Debtor involved, including

a run to the courthouse,which would result, in an abandonment of the orderly and structured equitable

payments provided by the Plan.  Therefore, dismissal of the Case is not a viable alternative for creditors.

### C.    Alternative Plan of Reorganization

If the Plan is not confirmed, at present, Debtor does not foresee a different plan.  Debtor believes

that the Plan will provide the greatest and most expeditious return to creditors.


# X.    TAX EFFECTS

Based on Debtor's net operating carry loss forwards, the provisions of the Puerto Rico Internal

Revenue Code of 2011, as amended, and the tax provisions of the Bankruptcy Code, Debtor expects that

the implementation of the Plan will not have any tax effects.

# XI.    CONCLUSION

The Debtor submit that the Plan is fair and reasonable and in the best interest of the Estate and

Creditors and offers the best possible recovery for Creditors under the circumstances.   The Debtor

therefore urges creditors to vote in favor of the Plan.

San Juan, Puerto Rico this 17th day of April, 2015.


**SAN JUAN RESORT OWNERS, INC.**
1428 Paz Granela
Urb. Santiago Iglesias
San Juan, Puerto Rico  00921



**Luis A. Carreras Pérez**
**President**

**EXHIBIT A-1**
**San Juan Resort Owners, Inc. CLASS 1**
**The Allowed Claims of Banco Popular de Puerto Rico**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| **IN RE:**<br><br>**San Juan Resort Owners, Inc.**<br><br>**Debtor**<br><br>**1428 Paz Granela**<br>**Urb, Santiago Iglesias**<br>**San Juan, P.R. 00921** | **CASE NO. 15-01627 (MCF)**<br><br><br>**CHAPTER 11** |

### CLASS [1] BALLOT FOR ACCEPTING OR REJECTING
### PLAN OF REORGANIZATION OF
### San Juan Resort Owners, Inc.

**San Juan Resort Owners, Inc.** filed its plan of reorganization dated _____, 2015, (the "Plan") for the Debtor in this case.  The Court has approved the Disclosure Statement with respect to the Plan (the "Disclosure Statement").  The Disclosure Statement provides information to assist you in deciding how to vote your ballot.  If you do not have a Disclosure Statement, you may obtain a copy from **William Vidal Carvajal Law Office, P.S.C., MCS Plaza, Suite 801, Ponce De León Avenue, San Juan, P.R. 00918.** Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

**You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan.  Your claims have been placed in Class [1] under the Plan. If you hold claims in more than one class, you will receive a ballot for each class in which you are entitled to vote.**

**If your ballot is not received by William Vidal Carvajal Law Office, P.S.C., MCS Plaza, Suite 801, Ponce De León Avenue, San Juan, P.R.  00918, on or before _____, 2015 at 4:00 P.M. (EST.), and such deadline is not extended, your vote will not count as either an acceptance or rejection of the plan.**

**If the Plan is confirmed by the Bankruptcy Court it will be binding on you whether or not you vote.**

**EXHIBIT A-1**
**San Juan Resort Owners, Inc. CLASS 1**
**The Claim of Banco Popular de Puerto Rico**
**Page 2 of 2**

ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned, the holder of a Class [1] claim against the Debtor, in the unpaid amount of $_____ ($_____).

☐ACCEPTS THE PLAN                    ☐REJECTS THE PLAN

Dated: _____

Print or type name of creditor: _____

Signature:_____

Name and Title:_____

Address:_____

_____

RETURN THIS BALLOT TO:

**San Juan Resort Owners, Inc.**
**c/o William Vidal Carvajal Law Office, P.S.C.**
**MCS Plaza, Suite 801**
**Ponce de León Ave.**
**San Juan, PR  00918**

**EXHIBIT A-2**
**San Juan Resort Owners, Inc. CLASS 2**
**The Holders of Allowed General Unsecured Claims**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| **IN RE:** | |
| **San Juan Resort Owners, Inc.** | **CASE NO. 15-01627 (MCF)** |
| **Debtor** | **CHAPTER 11** |
| **1428 Paz Granela**<br>**Urb, Santiago Iglesias**<br>**San Juan, P.R. 00921** | |

### CLASS [2] BALLOT FOR ACCEPTING OR REJECTING
### PLAN OF REORGANIZATION OF
### San Juan Resort Owners, Inc.

**San Juan Resort Owners, Inc.** filed its plan of reorganization dated _____, 2015, (the "Plan") for the Debtor in this case.   The Court has approved the Disclosure Statement with respect to the Plan (the "Disclosure Statement").   The Disclosure Statement provides information to assist you in deciding how to vote your ballot.  If you do not have a Disclosure Statement, you may obtain a copy from **William Vidal Carvajal Law Office, P.S.C., MCS Plaza, Suite 801, Ponce De León Avenue, San Juan, P.R.  00918.**  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

**You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan.  Your claim has been placed in Class [2] under the Plan. If you hold claims in more than one class, you will receive a ballot for each class in which you are entitled to vote.**

**If your ballot is not received by William Vidal Carvajal Law Office, P.S.C., MCS Plaza, Suite 801, Ponce De León Avenue, San Juan, P.R.  00918, on or before _____, 2015 at 4:00 P.M. (EST.), and such deadline is not extended, your vote will not count as either an acceptance or rejection of the plan.**

**If the Plan is confirmed by the Bankruptcy Court it will be binding on you whether or not you vote.**

**EXHIBIT A-2**
**San Juan Resort Owners, Inc. CLASS 2**
**The Holders of General Unsecured Claims**
**Page 2 of 2**

ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned, the holder of a Class [2] claim against the Debtor, in the unpaid amount of $_____ ($_____).

☐ACCEPTS THE PLAN                    ☐REJECTS THE PLAN

Dated: _____

Print or type name of creditor: _____

Signature:_____

Name and Title:_____

Address:_____

_____

RETURN THIS BALLOT TO:

**San Juan Resort Owners, Inc.**
**c/o William Vidal Carvajal Law Office, P.S.C.**
**MCS Plaza, Suite 801**
**Ponce de León Ave.**
**San Juan, PR  00918**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | Case No. 15-01627(MCF) |
| SAN JUAN RESORT OWNER, INC. | Chapter 11 |
| Debtor. | |

**MOTION FOR ENTRY OF THE SALE ORDER: (A) APPROVING THE ASSET PURCHASE AGREEMENT AND SALE OF THE SALE ASSETS, FREE AND CLEAR, TO THE STALKING HORSE PURCHASER OR TO THE SUCCESSFUL BIDDER, (B) APPROVING THE BIDDING PROCEDURES TO SOLICIT HIGHER AND BETTER OFFERS AND SELECT THE SUCCESSFUL BIDDER, AND (C) APPROVING THE SETTLEMENT AGREEMENT WITH BANCO POPULAR**

**TO THE HONORABLE UNITED STATES**
**BANKRUPTCY COURT:**

**COME NOW** San Juan Resort Owner, Inc. (the "Debtor") and secured creditor Banco Popular de Puerto Rico ("BPPR") (jointly, the "Parties"), each by their respective undersigned counsel, and respectfully submit this Motion for Entry of the Sale Order: (A) Approving the Asset Purchase Agreement and Sale of the Sale Assets, Free and Clear, to the Stalking Horse Purchaser or to the Successful Bidder, (B) Approving the Bidding Procedures to Solicit Higher and Better Offers and Select the Successful Bidder, and (C) Approving the Settlement Agreement with BPPR (the "Sale Motion").

### Preliminary Statement

Debtor is the owner of a 96-room boutique-style beachfront hotel, located in the Condado sector of San Juan, Puerto Rico, known as San Juan Beach Hotel (the "Hotel"). Prior to commencing this bankruptcy case, the Debtor, as detailed below, received proposals from various interested parties to purchase the Hotel. To maximize the potential value of the estate, the Debtor engaged in substantial negotiations with its secured creditor, BPPR, and with parties interested in purchasing the Debtor's assets, in order to attempt to present (subject to Court

approval as provided herein) a consensual bankruptcy proceeding that allows the Debtor to maximize recoveries, minimize or eliminate potential disputes with its secured creditor, and to provide for an orderly sale process which is open to all interested bidders. As part of those negotiations and to ensure the viability of this bankruptcy case, the Debtor also solicited pre-petition proposals from all interested parties to participate as a proposed stalking horse purchaser. The result of those negotiations, as well as those conducted after the filing of this case, are included as part of this Sale Motion for approval by this Court.

Accordingly, through this Sale Motion, the Parties request that the Court enter an order approving the stalking horse proposal made by SJ Beach PR LLC an affiliate of Paulson PRV Acquisitions, LLC and the sale to such purchaser, the bidding procedures pursuant to which the Debtor will market the assets available for sale and solicit higher and better offers to that presented by the stalking horse purchaser, and the settlement agreement entered into between BPPR and the Debtor. The sale includes the sale of the Hotel and the personal property located within the Hotel owned by Debtor (the "Sale Assets") free and clear of all liens, claims and encumbrances as set forth herein.

Further, to facilitate the sale of the Hotel, that certain personal property located in the Hotel which is owned by Premier Hotel Management, Inc. ("PHM"), an affiliate of the Debtor, that are used and necessary for the operation of the Hotel (the "PHM Assets") is also being sold as part of the proposed sale. While PHM is not a debtor in possession and the PHM Assets are not part of this case nor subject to the Bidding Procedures, since the PHM Assets are used or necessary for the operation of the Hotel, the Debtor has obtained the agreement from PHM to sell the PHM Assets to the stalking horse purchaser or to any successful bidder as detailed below.

00236509; 1

The Parties understand that the sale process included herein, which includes an open process where any party that is interested can present an alternative transaction, subject to the bidding procedures, which is higher and better than that presented by the stalking horse purchaser, is in the best interest of the estate, as it provides for an orderly sale process to maximize the value of the Debtor's assets.  Further, the settlement agreement entered into with BPPR paves the way for the sale process and the consensual resolution of this bankruptcy case, as through the carve-out negotiated with BPPR, the Debtor's estate will receive proceeds from the sale which would otherwise had gone to BPPR on account of its secured claim, to satisfy its obligations under a plan of liquidation and provide a distribution to creditors of the estate.  As detailed below, the settlement agreement is critical as BPPR's pre-petition claims against the Debtor exceed $17 Million and the total proposed purchase price for the Sale Assets and the PHM Assets is approximately $9.450 Million.

For these reasons, and those set forth below, the Parties request that the Court approve the Sale Motion, the Settlement Agreement (defined below) with BPPR, the Asset Purchase Agreement (defined below) with the stalking horse purchaser, the PRTC Agreement (defined below), and the Bidding Procedures (defined below) detailed and included with the Sale Motion (the Settlement Agreement, Asset Purchase Agreement, PRTC Agreement, and Bidding Procedures, collectively, the "Sale Documents").

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Puerto Rico Local Bankruptcy Rules 6004-1 and 9013-1.

## Background

A. The Bankruptcy Filing

1. On March 5, 2015 (the "Petition Date"), the Debtor filed a voluntary petition under the provisions of chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Puerto Rico (the "Bankruptcy Court"), Case No. 15-1627(MCF).

B. The Pre-Petition Loan Documents

2. Prior to the Petition Date, the Debtor entered into various credit facilities with BPPR detailed in the verified complaint attached as **Exhibit 1** (the "Credit Facilities").

3. As of the Petition Date, the Debtor owes to BPPR approximately $17,898,437.58 under the Credit Facilities for principal, interest, fees, charges and other amounts (collectively, the "BPPR Pre-Petition Claim") as set forth below:

| Loan Number | Principal | Interest | Other Charges* | TOTAL |
|---|---|---|---|---|
| 2754568-9002 | $11,517,123.46 | $3,939,695.07 | $184,919.06 | $15,641,737.59 |
| 2754568-2001 | $1,800,000.00 | $456,699.99 | $0.00 | $2,256,699.99 |
| ----------------- | **$13,317,123.46** | **$4,396,395.06** | **$184,919,06** | **$17,898,437.58** |

*Insurance and property taxes

4. To secure the obligations under the Credit Facilities and the amounts due under the BPPR Pre-Petition Claim, the Debtor, among others, executed the mortgages and security agreements detailed in the verified complaint attached as **Exhibit 1** (collectively with the Credit Facilities, the "Loan Documents") and granted first priority perfected security interests to BPPR over substantially all of the Debtor's assets, including the Sale Assets (collectively, the

00236509; 1

4

"Collateral"). Attached as **Exhibit 2** is a title study showing the legal description for the real estate (the Hotel) and the mortgage notes that BPPR holds over the same.

5.     Prior to the Petition Date, the Debtor defaulted under the terms of the Loan Documents and BPPR commenced foreclosure and collection proceedings. See **Exhibit 1**.

C.  The Pre-Petition Proposals to Acquire the Hotel

6.     Prior to commencing this case, the Debtor received a number of proposals from interested parties to purchase the Hotel.

7.     Specifically, on or about August 21, 2014, the Debtor executed an option agreement (the "Option Agreement") with Condado San Juan Hotel 2, LLC ("Condado San Juan") to sell the Hotel for an approximate amount of $8,250,000 with a net payment to BPPR of approximately $7,500,000.

8.     The Option Agreement was specifically conditioned, as a requisite for the agreement becoming effective, upon BPPR approving the discounted payoff transaction detailed in such agreement.

9.     On or about November 12, 2014, BPPR formally notified the Debtor that it did not approve the discounted payoff transaction detailed in the Option Agreement. The Debtor promptly advised Condado San Juan of such determination. Accordingly, the Option Agreement never became effective, as the transaction detailed therein was not approved by BPPR. Nonetheless, in the event that the Option Agreement is somehow effective, which the Debtor understands would be contrary to the terms of the Option Agreement, the Debtor filed on March 11, 2015 a motion to reject the Option Agreement.

00236509; 1

5

10. During August 2014, the Debtor also received proposals to acquire the Hotel from Paulson PRV Acquisition Corp. and from SRE Acquisitions II, LLC ("SRE"). The Debtor did not accept Paulson PRV Acquisition Corp. or SRE's proposals at that time.

11. Commencing in December 2014, the Debtor engaged in substantial negotiations with its secured creditor, BPPR, to attempt to structure a consensual sale process that would maximize recoveries for the estate, resolve the pending litigation with BPPR, reach an agreement with BPPR on a carve-out and minimum distribution to BPPR from any sale, and provide an opportunity for all interested parties to participate in the sale in an open and transparent process.

12. Accordingly, the Debtor proposed to commence a bankruptcy case, after reaching an agreement on the sale process and minimum distribution with BPPR, to provide for a sale process as detailed herein where all interested parties could submit their proposal to acquire the Hotel, and the value of the estate's assets would be maximized.

D. The Settlement Agreement with BPPR.

13. The Debtor's negotiations with BPPR culminated with the execution, on March 5, 2015 (prior to the Petition Date) of a Settlement Agreement (the "Settlement Agreement") between BPPR and the Debtor, among other borrowers. The Settlement Agreement is included as **Exhibit 3** and incorporated as if set forth in full herein. In summary, the Settlement Agreement includes[1]:

- Consent to Sale, Settlement Payment, and Bidding Procedures. As part of the Settlement Agreement, BPPR provided its consent to sale process and bidding

---

[1] The following is provided as a summary only of the terms of the Settlement Agreement. The Settlement Agreement controls the terms agreed to between the Debtor and BPPR and in the event of any inconsistency between the summary or Sale Motion and the Settlement Agreement, the Settlement Agreement controls.

procedures detailed herein and to accept the Settlement Payment[2] in exchange for, among other things, releasing all of its liens over the Sale Assets.

- Consent to Carve-Out. As part of the Settlement Agreement, BPPR agreed to the substantial carve-out from the sale proceeds that would otherwise had been paid to BPPR. Specifically, as part of the Settlement Agreement, BPPR has consented to the Carve-Out[3] from the Purchase Price[4] in an amount that shall not exceed $1,181,627.00 to pay from such Carve-Out solely as administrative and certain priority tax and other claims, the amounts necessary to settle the existing claims and expenses set forth in **Exhibit 4**.

- Increases to Settlement Payment to BPPR. As part of the Settlement Agreement, the Debtor agreed that the Settlement Payment to BPPR shall be increased by an amount equal to 100% of any funds received as part of the Sale and/or any loan obtained in order to effect the Settlement Payment, in excess of the amounts necessary to cover (i) the initial Settlement Payment; and (ii) the amounts necessary to settle any of the existing debts set forth in **Exhibit 4** or Schedule II of the Settlement Agreement. In other words, the Settlement Payment to BPPR shall be increased by 100% of: (a) any reduction in the amounts needed to satisfy the claims set forth in **Exhibit 4** or Schedule II to the Settlement Agreement from the amounts already budgeted in such schedule; as well as (b) any increases to the sale price as a result of receiving a higher and better offer through the bidding procedures. The Debtor also agreed that in no event shall the amount of the

---

[2]   As that term is defined in the Settlement Agreement.
[3]   As that term is defined in the Settlement Agreement.
[4]   As that term is defined in the Settlement Agreement.

Carve-Out from the Purchase Price exceed $1,181,627.00, which may be reduced as contemplated herein and in the Settlement Agreement.

- <u>Other Terms</u>.   While not relevant to this proceeding as it involves assets and credit facilities that are not part of the estate, BPPR and the Debtor submit, in the interest of full disclosure of the terms of the Settlement Agreement, that on the Closing Date[5] and subject to the terms and conditions of the Settlement Agreement, the other borrowers and signatories under the Settlement Agreement (e.g., not the Debtor or any debtor-in-possession) would be released from their separate credit facilities that do not form part of this estate.

14.      The Debtor understands that through the Settlement Agreement that it negotiated and entered into, as well as the agreement on the Carve-Out, upon closing of the Sale and receipt of the Carve-Out, the Debtor would generate sufficient proceeds to fund and provide the required distributions under the Plan.  The Debtor also understands that without the Settlement Agreement that it negotiated, the full amount of the sale price would have been paid to BPPR, considering the amount of the BPPR Pre-Petition Claim (over $17 Million) and the proposed total purchase price for the Sale Assets and PHM Assets (approximately $9.450 Million) and BPPR would have foreclosed over its Collateral, including the Hotel, all of its accounts receivable and any other personal property of the Debtor which form part of the BPPR Collateral.

E.      <u>Pre-Petition Proposals for Stalking Horse Purchaser</u>

15.      To ensure the viability of this bankruptcy case and that the Debtor could comply with the minimum Settlement Payment agreed to under the Settlement Agreement and thus receive the benefits of the Carve-Out, prior to commencing the case, on February 17, 2015, the

---

[5]      As that term is defined in the Settlement Agreement.

Debtor circulated, by electronic and certified mail, a proposed bid and sale procedure to all parties that had shown an interest in acquiring the Hotel.  A copy of the proposed bid procedures, that were circulated is included as **Exhibit 5**.

16.      As part of the proposed sale procedures, the Debtor requested all interested bidders to submit their proposals to participate as a potential "stalking horse purchaser" for the sale of the Hotel through this bankruptcy case.

17.      As a result of such efforts, the Debtor received two proposals to participate as a "stalking horse purchaser" under the proposed bidding procedures.  After analyzing such proposals and discussing them with BPPR, the Debtor selected SJ Beach PR LLC ("Paulson") as having made the highest and best offer for the Sale Assets and to participate as a stalking horse purchaser through the proposed bidding procedures.

F.      The Stalking Horse Asset Purchase Agreement

18.      Since the Petition Date, and after receiving the proposal detailed above, the Debtor has engaged in substantial negotiations with Paulson to attempt to reach an agreement on the sale of the Sale Assets as a stalking horse through the bidding procedures set forth herein.

19.      Accordingly, on March 27, 2015, Paulson and the Debtor agreed on terms of the asset purchase agreement set forth as **Exhibit 6**, which sets forth the terms upon which Paulson will acquire and the Debtor will sell, subject to Court approval and the bidding procedures set forth herein, including, the receipt of higher and better offers, the Sale Assets.

20.      The terms of the proposed sale to Paulson (the "Stalking Horse Proposal") are detailed in the Asset Purchase Agreement (the "APA") set forth on **Exhibit 6**.

21.      The Sale to the Stalking Horse Purchaser, or to any Successful Bidder, involves the sale of the Sale Assets and that certain personal property located in the Hotel which is owned

by PHM, an affiliate of the Debtor, that are used and necessary for the operation of the Hotel and listed in Schedule F to the APA (the PHM Assets). PHM is not a debtor in possession, the PHM Assets are not part of this estate, and the sale of the PHM Assets is not subject to Court approval. However, since the PHM Assets are used or necessary for the operation of the Hotel, PHM has agreed to sell the PHM Assets to the Stalking Horse Purchaser, through a separate asset purchase agreement, or to the Successful Bidder for the amount of $410,443.00 (the "PHM Purchase Price"). The PHM Assets and PHM Purchase Price are not subject to the Bidding Procedures. In other words, PHM shall sell the PHM Assets to the Stalking Horse Purchaser or to any Successful Bidder for the same amount as the PHM Purchase Price.

22.     The terms of the APA are incorporated as if set forth in full herein. In summary, the Stalking Horse Proposal and APA includes[6]:

- Purchase Price:  $9,450,000, consisting of (a) a cash payment of $8,689,557.00 on the closing date, (b) savings of approximately $350,000, as detailed below, from the amounts budgeted in the initial carve-out for the Puerto Rico Tourism Company (the "PRTC"), and (c) the PHM Purchase Price for the PHM Assets ($410,443).

- PRTC:  Paulson has reached a preliminary agreement with the PRTC, subject to confirmation by the PRTC, upon issuance of the Sale Order requested herein, for PRTC to accept a discounted payment from Debtor, on the Closing Date, of the amount initially budgeted by the Debtor for the PRTC as part of the initial Carve-

---

[6]     The following is provided as a summary only of the terms of the APA. The APA controls the terms agreed to between the Debtor and Paulson and in the event of any inconsistency between the summary or Sale Motion and the APA, the APA controls the agreement between the Debtor and Paulson.

Out, provided that Paulson is the Stalking Horse Purchaser.[7]   Specifically, as set forth in the letter included as **Exhibit 7** to the Sale Motion (the "PRTC Agreement"), the PRTC has agreed to accept, on the Closing Date, the amount of $616,326 in full accord and satisfaction of all amounts owed to the PRTC as of the Petition Date which amounts total approximately $1,058,983 as per the terms of a settlement agreement between PRTC and Debtor, to be executed at closing (the "PRTC Settlement").

- <u>Settlement Payment to BPPR.</u>  A net and minimum Settlement Payment to BPPR in the amount of $7,857,930.00.

- <u>Carve-Out.</u>  Based on the savings detailed above on the claim by PRTC through the PRTC Agreement, a Carve-Out agreed to by BPPR in the amount of $831,627.

- <u>Deposit</u>: A cash deposit in the amount of $1,000,000.00 subject to the terms and conditions set forth in the APA.

- <u>Inspection Period:</u>  An inspection period that expires on the 30th day from the date that this Sale Motion is filed, as set forth in the APA.

- <u>Bid Protections:</u>  A break-up fee of 3% of the purchase price and certain expense reimbursements up to a maximum amount of $25,000, as set forth in the APA, in the event that a higher and better offer for the Sale Assets is received and accepted and the Sale Assets sold to such bidder.

---

[7]       Accordingly, this discount reduces the amount of the Carve-Out required to satisfy the budgeted claim of the PRTC and the $350,000 in savings provides a higher Settlement Payment to BPPR.

- <u>Closing Date:</u> Within the time frame set forth in the Bidding Procedures, subject to the prior satisfaction of the conditions to close detailed in the APA.

G.    <u>The Bidding Procedures:</u>

23.    The sale to the Stalking Horse Purchaser is proposed under the Bidding Procedures set forth and included as **Exhibit 8** herein.  The Bidding Procedures are incorporated as if set forth in full herein.   In summary, the Bidding Procedures include the terms and conditions detailed below[8].

24.    The Sale is subject to competitive bidding and an auction process, and higher or otherwise better offers being made with respect to the Sale Assets.

25.    The Bidding Procedures provide the terms to consider and submit proposals to acquire the Sale Assets, the requisites for any such proposals, the deadline to submit them, the time-frame for parties to conduct due diligence, the proposed auction date, as well as the selection of the Successful Bidder (as that term is defined in the Bidding Procedures).

H.    <u>Sale Hearing</u>

26.    As part of the approval of the Bidding Procedures, the Debtor and BPPR are requesting that a hearing to consider the approval of the Sale Motion, the Sale, Settlement Agreement, PRTC Settlement, APA, and the Bidding Procedures is held (the "Sale Hearing") and concluded within the next thirty (30) days. The Debtor and BPPR affirm that a prompt determination is needed given the closing deadlines and conditions included in the APA and the Stalking Horse Proposal and to ensure that the Parties can comply with the terms set forth therein.  Further, the Parties would like to provide certainty to potential bidders of the Bidding

---

[8]    The following is provided as a summary only of the terms of the Bidding Procedures.  The Bidding Procedures control the terms of the Sale and in the event of any inconsistency between the summary or Sale Motion

Process that is approved by the Court, which would require a prompt determination given the number of parties that have expressed interest in the Sale.      Accordingly, the Parties request from this Court that the Sale Order be approved and entered as soon after the conclusion of the Sale Hearing as practicable and no later than the deadlines provided in the Bidding Procedures and APA.

> H.      Sale Order

27.      As part of the Sale, a condition to the effectiveness of the APA, the Stalking Horse Proposal, and to the obligations of BPPR and the Debtor therein, is the entry of the Sale Order by the Bankruptcy Court, similar in form to the proposed Sale Order under **Exhibit 9**, approving, without limitation, this Sale Motion, the Bidding Procedures, the Settlement Agreement, the APA, the PRTC Agreement and the exectution of the PRTC Settlement, and including the findings and determinations relating to the Sale Documents included in the proposed Sale Order.

**Supporting Authority**

**A. Sale of the Assets Free and Clear of all Liens, Claims, Encumbrances and Interests**

Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to use or sell assets of the estate, other than in the ordinary course of business, free and clear of liens, claims and encumbrances. See 11 U.S.C. § 363(b)(1); see also Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test, *i.e.*, whether a sale is supported by a sound business reason and is based on a sound exercise of

---

and the Bidding Procedures, the Bidding Procedures (as may be modified by the Court) control the sale process.

business judgment. 3-363 Collier on Bankruptcy P 363.02. "The court should not substitute its judgment for the trustee's but should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms. Id.

The "sound business purpose test" consists, mainly, of four factors to consider when determining whether a pre-confirmation sale of a chapter 11 debtor's assets is appropriate: (i) a sound business reason or emergency justifying the sale; (ii) good faith; (iii) adequate and reasonable notice; and (iv) that the price to be paid is fair and reasonable. Courts have consistently held that approval of a proposed sale of property pursuant to Section 363(b) is appropriate if the record reveals a "good business reason" for approval of the proposed sale. See, In re Eldercare, 390 B.R. 762, 770 (Bankr. D. Conn. 2008); In re Phoenix Steel Corp., 82 B.R. 334, 335 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a Section 363 sale are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith.") The Court may find that a sound business purpose for the sale of assets property of debtor outside the ordinary course of business exists when such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. Comm. of Equity Security Holders v. The Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2nd Cir. 1983).

The Parties submit that the sale of the Hotel to Paulson or the Successful Bidder satisfies the "sound business reason test" and is a proper exercise of the Debtor's business judgment. The transfer of the Hotel is supported by the following sound business reasons: (a) there is a risk of deterioration of the value of the Hotel if the sale is not consummated; (b) the Sale will present the best opportunity to maximize the value of the estate on an ongoing concern basis and avoid decline and devaluation of the Hotel that could arise in the absence of approval of the Sale

Documents and continued litigation with BPPR; (c) unless the sale, Settlement Agreement and Carve-Out are approved, creditors' recoveries will be zero given the amount of the BPPR Pre-Petition Claim; (d) the Debtor is satisfying an obligation of over $17,000,000.00 through the Sale, Settlement Agreement, and Settlement Payment and providing a distribution to the estate; and (e) part of the Carve-Out proceeds will be distributed to unsecured creditors who would otherwise receive nothing from any disposition of the Hotel.  Further, the Sale is proposed as an open bidding, where any interested bidder that qualifies under the Bid Procedures may present its proposal to acquire the Sale Assets.  See, In re Wiedbolt Stores, Inc., 92 B.R. 309, 312 (N.D. Ill. 1988) (concluding that the Bankruptcy Court authorized a transfer in lieu of foreclosure as a sale under section 363 as the transfer in exchange for the release of a $64,000,000.00 was a transfer of assets for value. Furthermore, the Court noted that Bankruptcy Rule 6004 expressly provides for private sales.).  See also Palmas Country Club Inc., Case No. 10-07072 (ESL) (approving private sale and transfer to pursuant to section 363 of the Bankruptcy Code lender in exchange for satisfaction of lender's claims).

Further, the main alternative to the sale is the continuation of the state court action and foreclosure proceedings by BPPR. The Parties believe that a foreclosure sale will yield no proceeds for the Debtor's estate. Furthermore, the Carve-Out established in the Settlement Agreement and Sale Motion will not be available in a foreclosure.

Accordingly, the Debtor submits that approval of the Sale Documents is supported under the case law set forth above.

## B.  Break-up Fee and Expense Reimbursement

"A breakup fee is a fee payable to a potential buyer if the transaction fails for any reason not within the buyer's control... [e]xpense reimbursement requires the estate to reimburse the

00236509; 1

potential buyer's due diligence and contract negotiation expenses, including professional fees, if the buyer's transaction is not approved." 3-363 Collier on Bankruptcy P 363.02. Courts have adopted as a rule of thumb a limitation on a breakup of about 3 percent of the consideration the buyer will pay for the assets.

Approval of break-up fees and expense reimbursements in connection with the sale of a debtor's property pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. See In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001); Gey Assocs. v. 310 Assocs. (In re 310 Assocs.), 346 F.3d 31, 33-34 (2d Cir. 2003); 3 Collier on Bankruptcy P 363.03[7] (15th rev. ed. 2002) ("It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated."). The basis for approving a break-up fee and expense reimbursement is the advantage provided by the stalking horse bid to both the buyers and sellers in that it (a) encourages additional, competitive bidding, (b) supports the sellers' attempts to receive the highest or otherwise best offer and (c) compensates the buyer for the risk of being outbid. See In re Ryan, 261 B.R. at 870.

Many bankruptcy courts approve break-up fees under the "business judgment rule standard." Under that standard, courts grant deference to the actions of the Debtor taken in good faith and in the exercise of honest business judgment. Specifically, courts have approved break-up fees so long as (a) the relationship between the parties is not tainted by self-dealing, (b) the fee does not hamper bidding and (c) the amount of the fee is reasonable in relation to the size of the transaction. Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992),appeal dismissed,3 F.3d 49 (2d Cir. 1993).

00236509; 1

16

The break-up fee here should be approved under the "business judgment rule" standard. First, the parties negotiated the APA and Bid Procedures, including the break-up fee at arm's length. Second, the break-up fee should not hamper bidding, given that the amount of the fee is reasonable in light of the size of the transaction and is similar in size to other break-up fees that have been approved.

The Parties understand that Paulson would not enter into the APA without the Break-Up Fee and Expense Reimbursement (as defined in the APA). The Parties understand that the APA is critical to the Sale and Bidding Procedures, as it sets a floor to market and sell the Sale Assets, and provides potential qualified bidders a basis upon which to evaluate (or re-evaluate) the proposed transaction and submit a higher and better alternative transaction. Such renewed interest will likely assist the Debtor in conducting a competitive auction, the outcome of which will be the highest or otherwise best offer for the Hotel. Further, payment of the Break-up Fee and Expense Reimbursement would be funded from the additional bid increment provided under any higher or better offer to the Stalking Horse Proposal by any other Successful Bidder.

Accordingly, the Parties request that the Court approve the APA with the bid protections included therein.

## C. The Successful Bidder Should be Afforded all Protections under Section 363(m)

Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) of the Bankruptcy Code may be later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

00236509; 1

17

11 U.S.C. § 363(m).

Essentially, section 363(m) affords "finality to judgments approving sales in bankruptcy by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids. . . . The finality and reliability of the judicial sales enhance the value of the assets sold in bankruptcy." In re Stadium Management Corp., 895 F.2d 845, 847 (1st Cir. 1990) citing Tri-Cran, Inc. v. Fallon (In re Tri-Cran, Inc.), 98 Bankr. 609, 617 (Bankr.D.Mass. 1989) (citations omitted); In re Onouli-Kona Land Co., 846 F.2d 1170, 1172-73 (9th Cir. 1988); In re Sax, 796 F.2d 994, 998 (7th Cir. 1986).

The effect of § 363(m) is that "when an order confirming a sale to a good faith purchaser is entered and a stay of that sale is not obtained, the sale becomes final and cannot be reversed on appeal." In re Stadium Management Corp., 895 F.2d at 847 quoting Creditor Committee v. Armstrong Business Credit Corp. (In re Saco Local Development Corp.), 19 Bankr. 119, 121 (BAP 1st Cir. 1982). Absent a stay, the court must dismiss a pending appeal as moot. In re Stadium Management Corp., 895 F.2d at 847 citing In re the Charter Co., 829 F.2d 1054 (11th Cir. 1987) (per curiam), cert. denied, 485 U.S. 1014, 108 S. Ct. 1488, 99 L. Ed. 2d 715 (1988); Miami Center Partnership v. Bank of New York, 820 F.2d 376, corrected in part and rehearing denied, 826 F.2d 1010 (11th Cir. 1987), vacating [826 F.2d 1010], reaffirming [820 F.2d 376] and rehearing denied, 838 F.2d 1547 (11th Cir. 1988), cert. denied, 488 U.S. 823, 109 S. Ct. 69, 102 L. Ed. 2d 46 (1988); In re Sax, 796 F.2d 994 (7th Cir. 1986); International Union, U.A.W. v. Morse Tool, Inc. (In re MTI Holding Corp.), 85 Bankr. 666, 668 (D.Mass. 1988).

Although the Bankruptcy Code does not define "good faith purchaser", courts have adopted the traditional equitable definition of one who purchases the assets for value, in good faith, and without notice of adverse claims. To constitute lack of good faith, a party's conduct in

00236509; 1

18

connection with the sale must usually amount to fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. The Parties submit that Paulson is a "good faith purchaser" as defined above, and given the open and transparent sale process under the Bidding Procedures, any Successful Bidder should also be deemed a good faith purchaser as defined above.

### D. Free and Clear Sale

Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits the sale of the property free and clear of such interest; (b) the entity holding the lien, claim or encumbrance consents to the sale; (c) where the interest is a lien, the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction of its interest. 11 U.S.C. § 363(f).

The Parties will be able to satisfy the requirements under section 363(f) of the Bankruptcy Code, insofar as pursuant to the Bidding Procedures any entity holding liens, claims, encumbrances and other interests on the Sale Assets will receive notice of the Sale Motion and the Sale Hearing. Accordingly, all parties in interest will be given sufficient opportunity to object to the relief requested herein. To the extent, however, that any such entity does not object to the Sale, that entity should be deemed to have consented to the relief sought herein. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of

00236509; 1

objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted). Thus, to the extent that no party holding a lien objects to the relief requested in the Sale Order, the sale of the Assets free and clear of all Liens, except those liabilities expressly assumed by the purchaser, satisfies section 363(f)(2) of the Bankruptcy Code.

In addition, the Parties submits that the Sale Assets may be sold free and clear of all successor liability claims. Notwithstanding reference to the free and clear conveyance of "any interest" under section 363(f) of the Bankruptcy Code, that section has also been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims. Accordingly, the Parties requests that the Hotel be transferred to the Purchaser free and clear of all liens, claims and encumbrances, including without limitation those listed in Exhibit B of the Sale Order and all successor liability claims, and that the sale and transfer be exempt of payment of any and all required stamps and vouchers and other costs and expenses.

## NOTICES

The Parties have provided notice of this Sale Motion, by certified mail, to (collectively, the "Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the Stalking Horse Purchaser; (iii) all parties who received a copy of the pre-petition proposed procedures detailed above; (iv) all persons or entities that have requested notice of the proceedings in this chapter 11 case; (v) all parties who are known to claim liens or other interests upon the Sale Assets; (vi) all applicable federal, state and local taxing and regulatory authorities, including, but not limited to, the Puerto Rico Tourism Company; (vii) to the top twenty (20) unsecured creditors (as per the Debtor's schedules); (ix) any and all parties in interest.

00236509; 1

20

In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary.

WHEREFORE, the Parties respectfully request that the Court, on or before April 27, 2015:

(a) schedule the Sale Hearing on or before 30 days from the date of this Sale Motion;

(b) enter the Sale Order, similar to the proposed Sale Order under **Exhibit 9,** waiving any applicable stay period under Fed. R. Bankr. Proc. 6004(h);

(c) enter the Sale Order approving the APA (**Exhibit 6**) and the PRTC Settlement (**Exhibit 7**);

(d) enter the Sale Order approving the Settlement Agreement (**Exhibit 3**);

(e) enter the Sale Order approving the Bidding Procedures (**Exhibit 8**) to consider higher and better offers and the procedure for selecting the person or entity that submits the highest or otherwise best offer (the "Successful Bidder");

(f) enter the Sale Order approving the Sale to the Successful Bidder; and

(g) granting such other relief as is just and proper.

**RESPECTFULLY SUBMITTED.**

### NOTICE

Within twenty-one (21) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if you were served by mail, any party against whom this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the clerk's office of the United States Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by law; (ii) the requested relief is against public policy; or (iii) in the opinion of the court, the interest of justice requires otherwise.

**WE HEREBY CERTIFY** that on this same date, the Parties have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case, including, but not limited to, Debtor's

00236509; 1

counsel and the U.S. Trustee. Furthermore, the Parties have provided notice of this Sale Motion, by certified mail, to the Notice Parties.

In San Juan, Puerto Rico, this 27th day of March, 2015.

<table>
<tr><td>

**WILLIAM M. VIDAL CARVAJAL, PSC**
Attorney for Debtor
MCS Plaza
Suite 801
255 Ave. Ponce de Leon Ave.
Hato Rey, Puerto Rico 00918
Tel. 787 764-6867
Fax 787 764-6491

</td><td>

**O'NEILL & BORGES LLC**
*Attorneys for Banco Popular de Puerto Rico*
American International Plaza
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Tel.: (787) 764-8181
Fax: (787) 753-8944

</td></tr>
<tr><td>

*s/William M. Vidal Carvajal*
William M. Vidal-Carvajal
USDC No. 124803
William.m.vidal@gmail.com

</td><td>

*s/ Luis C. Marini*
Luis C. Marini
USDC No. 222301
luis.marini@oneillborges.com

*s/Myrna L. Ruiz-Olmo*
Myrna L. Ruiz-Olmo
USDC-PR No. 223209
myrna.ruiz@oneillborges.com

</td></tr>
</table>

00236509; 1